**AHI MACHINE TOOL AND DIE, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW), Intervenor.

**No. 19672.**

United States Court of Appeals, Sixth Circuit.

Oct. 7, 1970.

Stanley Lubin, Detroit, Mich., for intervenor.

Before CELEBREZZE and PECK, Circuit Judges, and O'SULLIVAN, Senior Circuit Judge.

O'SULLIVAN, Senior Circuit Judge.

Petitioner, AHI Machine Tool & Die, Inc., seeks review, and National Labor Relations Board asks enforcement, of an order of the Board, which found AHI Machine Tool & Die guilty of violating Section 8(a) (1) of the National Labor Relations Act, Title 29 USC § 158(a) (1). The Decision and Order are reported in 176 NLRB 57 (1969). The Board supported its trial examiner, who found that AHI had interfered with the right of four of its employees to engage in "concerted activities" protected by Section 7 of the Act by "constructively" discharging such employees. These four employees had walked off their jobs following—and allegedly to protest—the discharge of one of their fellow employees who had just assaulted a company foreman. The Board's order commands reinstatement of the alleged discriminatees, with back pay. We are of the view that the record does not contain substantial evidence that the alleged discriminatees were engaged in a protected activity when they walked off their jobs, or that they were discharged, or that they were denied re-employment.[1]

We deny enforcement.

Timothy K. Carroll, Detroit, Mich., for petitioner; Dykema, Wheat, Spencer, Goodnow and Trigg, Detroit, Mich., on brief.

Roger L. Sabo, Atty., N. L. R. B., Washington, D. C., for respondent; Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, John D. Burgoyne, Atty., N. L. R. B., Washington, D. C., on brief.

I. The Alleged Protected Activity.

AHI Machine Tool & Die, Inc., located in the environs of Mt. Clemens, Michigan, manufactures and sells tools and dies for industrial use. In March of 1968, the shop employed about fifty people, approximately twenty of whom

1. We should express at the outset our belief that the events here involved would never have been the subject of a complaint issued by the Regional Director, and no charges would ever have been filed, except for the need of the UAW-CIO to have the votes of the four alleged discriminatees counted in an agreed election among the employees of AHI Machine Tool & Die, Inc. By winning this case and thereby getting to count in its favor such four votes, the UAW-CIO will have won the election by one vote. We believe that it can be fairly inferred that except for the union's need to have their votes in the election, the involved employees would not have claimed that they were discriminatorily discharged. This subject will be developed in the opinion which follows.

were engaged in the tool and die department. The workmen in this department —toolmakers, diemakers, die sinkers and others—are known as the most highly skilled mechanics in industrial production. They are generally in short supply, and in much demand. That they enjoy such status and the independence it gives them is recognized. In the relevant period, the shop was busy, operating at a 58 hour week. The alleged discriminatees, Emerick, Cartwright, Osterman and Theriault, all employed in the tool and die department, were good friends of each other and of their fellow diemaker Virgil Jolly. On the morning of March 18, 1968, Louis Hypnar, described by management as a leader, but found by the Board to be a foreman, accused Jolly of "goofing off" at his job. Virgil, a much larger and younger man than Hypnar, knocked him to the ground. In testimony of the alleged discriminatees and in the trial examiner's decision, the violence of the assault is sought to be meliorated by stating that "Jolly grabbed Hypnar by the shirt and *pushed* the latter over a set of workhorses." However, an obviously unplanned and spontaneous observation by one of the General Counsel's witnesses, gave a more accurate description of the assault. This witness, one of the dischargees, told how men in the department went quickly to the scene and "grabbed ahold of Jolly [the aggressor] to keep him from doing anything else" and then,

" * * * Mr. Jolly wanted to take another *poke* at him but we were holding onto him, so he couldn't so then he calmed down a little and went over and started putting his tools away."

We are satisfied that the supervisor was not merely "touched" or "pushed". He was knocked over the workhorses by Jolly's blow. It is indeed a fair inference that Mr. Jolly was irritated by Mr. Hypnar's suggestion, when he found

Jolly away from his own bench, that Jolly was "goofing off". But such irritation did not, in our view, warrant the assault upon Hypnar.

An interesting sidelight on the affair was Jolly's later explanation that his irritation was enhanced by his then nursing of a post-St. Patrick's Day "hangover". The assault was on March 18, the day after St. Patrick's Day.[2] Dale J. Smith, president of AHI, told that some days after March 18 he saw Jolly in the plant and inquired about the fracas, asking Jolly, "What's the matter with you?" Jolly replied, "Well, I was disgusted and celebrating St. Patrick's Day and Monday morning was tough, and Louis [Hypnar] said a few things to me and I didn't like it * * * and I just hit him." Upon Smith's suggestion that he thought Jolly should apologize, Jolly did walk over, shake hands with Hypnar and apologize. This testimony stood undenied. No mention was made of the foregoing in the trial examiner's findings. We mention it to support our view that it has taken not a little straining to make AHI the culprit in what happened on March 18 and the days that followed.

Much is made of Hypnar's reaction to what happened to him. He quickly responded by telling Jolly that he was fired and to get his tools and get out. Whether or not Hypnar had the authority to fire Jolly, his conduct was a natural reaction to the assault, as was his answer to the suggestion of an employee, Jernberg, (a so-called leader, and in no way involved in the relevant activities) that they go in and talk it over with management. The examiner's findings suggest that among the reasons that prompted the four diemakers to walk out was that "Hypnar refused to permit the men a hearing when he refused Jernberg's suggestion that the men take their case to higher management." There is no sug-

2. The name Virgil Jolly does not suggest his likely observance of the birthday of St. Patrick. However, men of varying racial backgrounds have, not infrequently, found it acceptable to join their Irish friends in repeated raising of their glasses to the memory and honor of the great Saint. Also, the name of Jolly's maternal grandparents may have been O'Malley.

gestion in the evidence that the four alleged discriminatees desired, at that moment or at any other time, to "take their case to higher management." They had *never complained* of Hypnar before Jolly's assault on him, nor did they thereafter, although all of them were in the plant and in the presence of management on several occasions after they had walked out.

The trial examiner's opinion contains the following:

"The record further establishes that the men were unhappy with Hypnar's conduct *for some time* and that the Jolly incident was the explosion that resulted from what the men considered the *constant harassment visited upon them by Hypnar*."

and also that:

"In any event in the case at bar the striking of Hypnar by Jolly and the latter's discharge *were but the culmination of a series of disagreeable events*." (Emphasis supplied.)

These assertions are without evidentiary support. The trial examiner does not point out proofs of the "constant harassment" or "disagreeable events." Neither does he point to evidence from which they could be justifiably inferred. Certainly the day-to-day irritations that may be the product of a foreman's attempt to meet his responsibilities cannot be magnified into such inferences. It is understandable that diesinkers and diemakers, the much in demand aristocrats of the shop, do not accept easily criticism of their work or conduct. We set out below the total and only evidence of irritations caused by Hypnar's conduct as a supervisor. They do not add up to the "constant harassment" and the "disagreeable events" found by the trial examiner to have resulted in a walkout protected by Section 7 of the Act as "concerted activity."

William E. Emerick, an activist in the walkout, told of Hypnar, who was himself a skilled diemaker with long experience, being meticulous in overseeing the work of others:

"Well, if there was a couple of different ways of performing the job, why he [Hypnar] would tell me how he wanted it done, and especially in the die tryout, why, he would oversee the work there."

Emerick further testified:

"Q. Have there been any incidents in which he [Hypnar] has actually commented directly upon your work?

"A. Yes, a number of times he complimented me on doing a good job.

"Q. Has he ever criticized you for your work?

"A. No, not to my knowledge."

Emerick told of Hypnar scolding him for being late for work and leaving ahead of time, "on two different occasions he got on my back because I washed up a little early, and on two other occasions he got on me again because I was coming in late and a number of times it was for leaving early." The witness did not claim that he was not guilty of the infractions that prompted Hypnar's remarks. His fellow diemakers said that Hypnar usually opened the shop in the morning and was the last to leave at night. Emerick also apparently resented Hypnar's action in the redoing of a part that had become warped.

" *   *   * so we put them back into the press and at that time I felt I knew what I was doing because I had already done it once. And Mr. Hypnar *would not let me go ahead and do it as I saw fit*. He definitely told me what to do, every move to make, *which was a great deal of the reason for the dissention between Mr. Hypnar and myself*." (Emphasis supplied.)

On the morning of Jolly's assault on Hypnar, Emerick told of Hypnar looking over the part Emerick was working on and "said he felt I was making progress." At that point, Emerick asked for, and got, Hypnar's approval to leave work early that day.

Another of the alleged discriminatees, Richard Cartwright, gave this description of his unhappiness with Hypnar. Referring to his second period of employment with the company, which began January 8, 1968, he said:

"It was the very second day—and I happened to be eleven minutes late that morning and he bawled me out for being late and I said, 'Look, its only eleven minutes' and he said, 'Well I don't care. I've got six thousand hours I've got to get done here, and you guys come in late and you want to leave early, and everything.' And I said, 'Well, Louis, I can see you and I are never going to get along.'" (Emphasis supplied.)

Asked his reason for walking out with his friends, Emerick and other alleged discriminatees, Cartwright said:

"I left because of the fact that Louis was—well, in protest of Louis' actions. The profane language, and the fact that he would not meet with us."

Another one of the four who walked out, Peter R. Osterman, limited his description of Hypnar's irritating conduct to the day of the assault on Hypnar. Referring to that morning, he said:

"* * * early in the morning, he approached me using obscene [3] language, and he said, 'What are you doing?' and I told him that I was doing the work that I was assigned to. The work that I had been assigned to the previous week. * * * And he started jumping all over me for not doing my work, and I didn't answer him. I just let it go at that."

Without any description of any previous irritations, Osterman said:

"Well, it was just decided that *we* couldn't stay there any more. I mean Hypnar was going to climb all over everybody, period, as far as I was concerned. This seemed to be the general trend. And so *we* just decided

—and when I say *we* I'm speaking for myself, really—I decided to leave."

The following was also a part of Osterman's examination by the General Counsel:

"Q. Why did you leave, Mr. Osterman?

"A. Well, it was just—there was too much harassment.

"Q. What is your answer?

"A. I say there was just too much harassment going on for a short period of time, and this was going to go on for quite a length of time, and I felt it was a situation that if it wasn't Jolly then it would have been me or somebody else."

Mr. Osterman's testimony ended with the following cross-examination:

"Q. * * * You worked under him [Hypnar]?

"A. Right.

"Q. During this period of time?

"A. Yes.

"Q. Did you get along with him?

"A. Yes.

"Q. In general?

"A. Yes.

"Q. And that morning you didn't?

"A. No."

The last of the four, Gilbert Theriault, apparently had no contact with Hypnar on the day of the assault. He walked out, however, with his friends—the other three. He said that while they were walking out, Osterman said to him, "I've had enough of that place. Let's get out." Then followed:

"Q. Mr. Theriault, would you explain to the trial examiner why you left?

"A. Yes. They were all my friends, and I was going to stick with them, no matter. *And that's why I walked out.*" (Emphasis supplied.)

3. Each of the discriminatees said that on the morning of the assault Hypnar had used profane or obscene language. None of them, however, disclosed the style of the profanity.

The General Counsel did not produce Virgil Jolly, whose assault on Hypnar precipitated the walkout found by the Board to be a form of "concerted activities * * * for the mutual aid and protection" of the employees involved. His absence was not accounted for. The erstwhile foreman, Hypnar, was not called, admittedly because he was incapacitated following a series of coronary attacks.

We are of the opinion, suggested earlier, that this case was the product of the UAW-CIO's need to count the votes of the alleged discriminatees in an election held after they had left AHI employment.[4] Not one of the four alleged discriminatees ever filed charges against the company. In fact, no charges were made at all until May and June, after the election was held, and only then by a complaint filed by representatives of the UAW-CIO. The charges made by the UAW-CIO were not filed until after the election and after the union's need to sustain the validity of the alleged discriminatees' ballots.

There is no substantial difference between the original charge filed by the union on May 20, 1968, and the amended charge filed June 4, 1968. The charge against the company *was not* that the walkout was a protected, concerted activity to overcome "constant harassment," or "tensions" that were born of a "series of disagreeable events" preceding Jolly's assault on Hypnar. On the contrary, the amended charge read:

"Since on or about April 1, 1968, the above named employer has discriminated against Peter Osterman, Richard Cartwright, William E. Emerick, Gilbert Theriault, Lyle Raglitz, and William Terry by discharging them because of their concerted activity in behalf of Virgil E. Jolly following his discharge."[5]

Neither the original nor the amended charge was signed by any of the discriminatees. Each was signed by representatives of the UAW-CIO.

The Regional Director investigated the union's charges before issuing the complaint. Affidavits of the alleged discriminatees were obtained. These were not signed until June 19, 1968, again after the election which could not authorize the designation of the UAW-CIO as the bargaining agent for AHI employees unless the votes of the four discriminatees could be counted in favor of that union. In none of these affidavits is there a claim that the walkout of March 18 was but the culmination of a "series of disagreeable events" that had preceded the assault on Hypnar, nor that the men in AHI tool and die room had been under "constant harassment." It is worthy of note, too, that when the affidavits were signed on June 19, 1968, all four of the discriminatees were working in vari-

---

4. An agreed election had been held on April 26, 1968. At that election 36 ballots had been cast, 15 of which votes were against the UAW-CIO and 13 in favor. Management challenged 8 votes, which included those of the four alleged discriminatees and Virgil Jolly. The union challenged the votes of Hypnar and another on the ground that they were part of supervision. The Board sustained the respective challenges of Jolly's and Hypnar's votes, but denied the company's challenge of the ballots of the alleged discriminatees Emerick, Cartwright, Osterman and Theriault.

The only way, then, that the UAW-CIO could win the election was to have the four votes of the discriminatees counted in its favor. Success in defeating the challenge of such votes would provide the union with a victory by a count of 18 to

17. Inasmuch as these alleged discriminatees were never in the employ of the company after March 18, 1968, the only way to validate their voting at an election held on April 26, 1968, was to obtain a finding that they had been illegally discharged. The machinery to accomplish this was set in motion, not by the discriminatees, but by the UAW-CIO.

5. It should be noted that there is no contention that the AHI Company had any history of antiunionism. There was evidence that it had expressed a wish that a union come into the plant. Shortly after the March 18 incident, the President of AHI was meeting with the union representatives and readily consented to an election. It had no right to designate the union as a bargaining agent for all of its

ous tool and die shops.[6] When the complaint was finally constructed and issued on July 30, 1968, this the way it came out:

"14. The employees named in paragraph 13 above, ceased work concertedly and engaged in the strike, walkout or other concerted work stoppage referred to in paragraph 13 above, to protest the fact that on or about March 18, 1968, Respondents did discharge Virgil Jolly, another employee of the Respondents, employed at the AHI plant.

"15. On or about March 19, 1968, Respondents did discharge or otherwise terminate the employment of Richard Cartwright, William Emerick, Peter Osterman and Gilbert Theriault.

"16. Since the date of discharge or other termination of employment specified in paragraph 15 above, Respondents have failed and refused, and continue to fail and refuse, to reinstate said employees to their former or substantially equivalent positions of employment.

"17. Respondents did discharge and failed and refused and continue to fail and refuse to reinstate the employees named in paragraph 15 above, because said employees engaged in the conduct specified in paragraph 13 above, or in other concerted activities, for the purposes of collective bargaining or other mutual aid or protection.

"18. By the acts described above in paragraphs 15, 16 and 17, and by each of said acts, Respondents did interfere with, restrain, and coerce, and are interfering with, restraining and coercing their employees in the exercise of the rights guaranteed in Section 7 of the Act, and thereby did engage in and are engaging in, unfair labor practices affecting commerce within the

meaning of Section 8(a) (1) and Section 2(6) and (7) of the Act."

Thus the complaint makes no suggestion that the slugging of Hypnar was only the spark that set off a fuse long smouldering in the tool and die shop.

Not until the hearing which began on October 8th was it claimed that Jolly's assault upon Hypnar was "the culmination of disagreeable events," and "constant harassment" which preceded it. No charge or complaint contained any such averment and it is fair to infer that preparation for the hearing disclosed the need for something more than the discharge of Jolly following his assault on Hypnar to make the walkout a "protected activity."

It was the burden of the General Counsel to make out his case by substantial evidence. This is so, however lenient the Courts have been in allowing the Board and its examiners to draw inferences. Colonial Corp. of America v. NLRB, 427 F.2d 302 (6th Cir. 1970); NLRB v. Murray Ohio Mfg. Co., 326 F.2d 509, 513 (6th Cir. 1964); Lawson Milk Co. v. NLRB, 317 F.2d 756, 760 (6th Cir. 1963); NLRB v. Cleveland Trust Co., 214 F.2d 95, 99 (6th Cir. 1954).

We have set out at length the General Counsel's proofs for the purpose of making clear their inadequacy as substantial support for the findings made. We are constrained to say that the trial examiner's critical finding "that the walkout was the culmination of a *series of incidents* that affected the *welfare and working conditions* of the AHI Tool and Die Shop" is fiction and sophistry.

Since we find no substantial evidence to support the trial examiner's conclusion that the walkout was the culmination of a series of disagreeable events, only dissatisfaction over the treatment of Jol-

---

employees unless the union was chosen as such by the majority of its employees. Even if the company had consented to counting the ballots of Emerick, et al, such consent would be of no importance if Emerick, et al, were not, in fact, its employees at the time of the election.

6. The trial examiner sustained the General Counsel's objection to the company's offer to prove that the discriminatees were in the habit of moving around in the shops of the tool and die industry.

ly remains as a condition of employment at which "protected" concerted activity could be directed.

■ Virgil Jolly was properly discharged for cause. We consider the slugging of a supervisor to express resentment of his orders to be unlawful, violent and insubordinate. We are aware of those cases in other Circuits which do hold that a walkout in protest of a *lawful discharge for cause* of a fellow employee may, nevertheless, be protected concerted activity. NLRB v. Holcombe, 325 F.2d 508 (5th Cir. 1963); NLRB v. Puerto Rico Rayon Mills, Inc., 293 F.2d 941 (1st Cir. 1961); NLRB v. John S. Swift Co., 277 F.2d 641 (7th Cir. 1960); Summit Mining Corp. v. NLRB, 260 F.2d 894 (3d Cir. 1958); NLRB v. J. I. Case Co., 198 F.2d 919 (8th Cir. 1952); NLRB v. Globe Wireless, Ltd., 193 F.2d 748 (9th Cir. 1951); NLRB v. Peter Cailler Kohler Swiss Chocolates Co., 130 F.2d 503 (2d Cir. 1942). None of these cases, however, involved a walkout in sympathy with a discharged employee who violently and unlawfully slugged a supervisor. In those cases the discharged strikers, in good faith, albeit mistakenly, thought that the discharge of their fellow employee had been effected because of union activity or some other reason proscribed by the Act. In the instant case, there could be no good faith but mistaken belief that Jolly was discharged for union activity or was otherwise being treated unfairly or harshly for his conduct. It is our holding that the walkout of the four alleged discriminatees was not a concerted activity protected by Section 7 of the Labor Management Relations Act, Title 29 U.S.C. § 157.

■ If such a holding is erroneous, we, nevertheless, will deny enforcement of the Board's order for the reason, as we find, that the four employees involved were neither discharged nor denied reinstatement. We further emphasize that were we to assume, as found by the trial examiner, that the assault on Hypnar and the discharge of Jolly were consequences of "a series of incidents that affected the welfare and working conditions of the AHI Tool and Die Shop," at no time was management informed of such a situation and given the opportunity to correct it.

II.  Management was not aware or informed of the reason for the walkout.

Notwithstanding his finding that the walkout was protected concerted activity, the trial examiner was constrained to concede the total lack of any demands upon or communication to management which would afford enlightenment as to the reason for the walkout. He mentioned that there was no formal grievance procedure in this plant, apparently to fortify his conclusion that the only method by which these men could express themselves was by direct action—by walking out. Yet the evidence showed that Albert Ferns, who was Vice-President and Manager, would meet with the employees, including Emerick, et al. Hypnar was not brought into these meetings, and it is undenied that never did any of the discriminatees, or other people, tell management of difficulties claimed to have prevailed in the shop. The General Counsel produced as witnesses only the four discriminatees. Yet the record shows that the votes of twenty-five employees in the AHI toolroom were counted in the election. Some fifteen supported the union. None of them, other than the discriminatees, testified to support the claim of the baleful effect that Hypnar had upon those with whom he worked.

In discussing the law of this case, the examiner said, "The Supreme Court [in Washington Aluminum, 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298] held that the employees did not have to make such demand [needed improvement in their working conditions] at the time of the walkout but that demand may be made before, after, or at the time of the walkout." He said, however, that "In the instant case *there was no demand made at all*." (Emphasis supplied.) He went on to say that "This would seem to be

a fatal defect * * *," but he overcame this fatal defect by saying:

"It must be noted that the employees' attempt to air their grievances was blocked by Hypnar who refused to permit the men a hearing when he refused Jernberg's suggestion that the men take *their case* to higher management.

"Moreover, it cannot be claimed that AHI did not know what the cause or the purpose of the walkout was."

The latter is so, says the examiner, because when Vice-President Ferns, upon seeing the four walking out of the plant, asked Hypnar why they were doing so, Hypnar said, "I guess they are going out in sympathy with Jolly."

The examiner then moves on to the next inference by saying:

"Thus, AHI knew that the walkout was in furtherance of its employees' efforts to make management more responsive to their *demands for improvement in existing conditions*."

Treating first the last observation, we ponder how being told that four men were walking out in sympathy with a man who has just been fired for assaulting a foreman, was advice to management that the walkout was to further improvement in working conditions, *i.e.*, constant harassment by Hypnar, when no such demands had ever been made.

The examiner asserted that the employees' "attempt to air their grievance * * * or take their case to higher management" was blocked by Hypnar. What the testimony actually showed was that one Jernberg—a work leader—in the exciting events following the assault said, "I think we should meet with Al Ferns. Have a meeting and discuss this." To this Hypnar responded, "Nothing doing. There's nothing to discuss. He's fired." It should be noted that this suggestion of a meeting did not come from any of those who were about to walk out, and there is nothing to suggest that Jernberg was their spokesman. We do not know what there would be to discuss about the firing of a man who had just knocked a supervisor over some workhorses and

was getting ready "to poke him again," until restrained. The evidence further shows that one or more of the discriminatees were already getting ready to walk out, and it would be perfectly natural for the old and faithful servant of management, in the excitement of being physically assaulted, to say what he did, viz: "If any of you guys think I can't run this plant without you * * * you can pack your boxes and get out too."

No demands before, at the time of the assault, or thereafter, were made that unsatisfactory working conditions be eliminated. We observe further that if conditions prior to the assault were any part of the cause of the walkout, surely one or the other of the involved employees must have mentioned them to Smith, the President, or Ferns, the Vice-President, who the record shows, without dispute, were on friendly terms with all of them.

The following critical findings were made by the trial examiner:

"When the men walked out of the plant they did not inform any representative of management as to their reasons for walking out.

"The General Counsel's witnesses [Emerick, Cartwright, Osterman and Theriault] readily admitted that (1) they gave no specific notice of their leaving to anyone in higher management, and (2) they did not testify that they gave to management *at any time* the reasons for leaving. *To the layman, at least, this would appear to be a deficiency*."

To this Court also such indeed appears to be a serious deficiency in the Board's case.

III. Alleged discriminatees were not discharged or denied reinstatement.

A fair review of the proofs makes clear that the discriminatees never made any effort to return to work. They excuse this failure by the following story:

Emerick and Osterman returned to the plant the day after the assault. Osterman, however, remained at the gate. Emerick said that he was told by Jern-

berg, who was without any authority to speak for management, that their time cards had been pulled and that they were fired. There is no evidence that the pulling of the time cards was tantamount to discharge. *No other attempt to determine whether they had or had not been fired was made.* Osterman waited for Emerick at the gate and left with him. Cartwright said that sometime the day after the assault, he drove into the plant's parking lot and *not seeing any of the cars of his companions, assumed they had been fired.* They told him so when they saw him late in the day. Theriault just said he wasn't going back until his friends did.

Moreover, whatever their dislike for Hypnar on the day of the assault, the evidence shows a quite friendly relationship between management and the discriminatees. There was evidence that during the days that followed the walkout the discriminatees were told by management that it liked their work and suggested that they take off their coats and go to work.

Finally, these men were not discharged. We are not impressed that the company's insistence that they check out their tools and sign the so-called quit slips was a "constructive discharge." These men were demanding their pay and it is admitted that a clearance from the tool room was required when an employee quit his job. Each of these men joined in this function. They claim that they were coerced into signing the so-called quit slips. The fact is that the slips they signed did no more than contain the truth. The slip was entitled "Employment Termination." Boxes for checking whether the termination was "Quit," "Discharged," or "Laid Off" were provided. They all checked the box "Quit." Under "Comments" was written in the Vice-President's handwriting, "Walked off the job without authorization." That is exactly what they did and we are not impressed that these strong, individualists were coerced into signing these slips.

## IV. Conclusion.

We are satisfied that under the rule of Nat'l Labor Relations Bd. v. Universal Camera, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), the General Counsel failed to support his charges with substantial evidence.

The Board here relies on Nat'l Labor Relations Bd. v. Washington Aluminum Co., 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962). The case is not in point. There a group of employees walked out to protest the lack of heat in their working area.

> "The heat produced by these units was not always satisfactory and, even prior to the day of the walkout involved here, several of the eight machinists who made up the day shift at the shop *had complained from time to time to the company's foreman* 'over the cold working conditions.'" 370 U.S. at 10, 11, 82 S.Ct. at 1101.

The Supreme Court emphasized that "prior to the day they left the shop, several of them had *repeatedly complained to company officials* about the cold working conditions in the shop." In this case, there had not been any complaints as to working conditions prior to the walkout. In *Washington Aluminum,* the Supreme Court said further:

> "The findings of the Board, which are supported by substantial evidence and which were not disturbed below, *show a running dispute between the machine shop employees and the company over the heating of the shop on cold days*— a dispute which culminated in the decision of the employees to act concertedly in an effort to force the company to improve that condition of their employment." 370 U.S. at 15, 16, 82 S.Ct. at 1103.

In *Washington Aluminum* the Court did say—partially as dictum:

> "The language of § 7 is broad enough to protect concerted activities whether they take place before, after, or at the same time such a demand is made." 370 U.S. at 14, 82 S.Ct. at 1102.

In this case, however, there were no complaints "before, after or at the same time" as the walkout. The management, after the event, learned that Emerick and his companions walked out after, and only because, Jolly was fired for assaulting his foreman. That is all they learned. We do not consider that the walkout was an exercise of the,

> "right to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection * * *,"

as set out in Section 7 of the Act, Title 29 U.S.C. § 157. The discharge of the assaulter, Jolly, was not a violation of Section 8(a) (1) of the Act, § 158(a) (1) U.S.C. Title 29, which makes it an unfair labor practice,

> "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 of this title."

Enforcement is denied.

CELEBREZZE, Circuit Judge (dissenting).

I respectfully dissent.

In my opinion the record contains substantial evidence supporting the Board's findings: (I) that the four alleged discriminatees were engaging in protected activity; (II) that the management was aware of the purposes of their protest in "walking out"; and (III) that the management discharged and denied reinstatement to each of the four employees who walked out to protest their contentious working relations with their supervisor Hypnar. Based upon those factual findings, the United States Supreme Court's decision in N.L.R.B. v. Washington Aluminum Co., 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962), mandates this Court to treat the concerted protests of these non-union workers as an exercise of their Section 7 right "to engage in * * * concerted activities for the pur-

pose of * * * mutual aid or protection." 29 U.S.C. § 157 (1964).

I. The Protected Activity.

The majority rejects the Board's findings that for some time the discriminatees believed themselves to be under constant harassment by Hypnar and that their walkout, after Jolly struck Hypnar, and in response to Hypnar's challenge,[1] was but the culmination of a series of disagreeable events. I disagree.

In considering the substantiality of the evidence to support the Board's findings I am influenced by the entire chain of events which occurred prior to the walkout of the four alleged discriminatees.

Just after work began on March 18, 1968, Mr. Hypnar twice cautioned workers for not being attentive to their work. In each instance, the employees protested these verbal reprimands contending that they were discussing work-related problems. In both instances, Mr. Hypnar used profanity in making his reprimands and disbelieved the employees' explanations (in the first instance that Mr. Osterman and Mr. Cartwright were discussing a work-related problem and in the second that Mr. Jolly had to borrow one of Mr. Cartwright's tools). It was pursuant to this second reprimand of Mr. Jolly by Mr. Hypnar that harsh words and a scuffle developed.

Mr. Hypnar immediately fired Mr. Jolly and went into the plant office to speak with management. As Mr. Jolly emerged from this management meeting, one of the work leaders proposed that the morning's events be discussed. Mr. Hypnar refused and challenged any employees who think the plant can't run without them, to "pack your boxes and get out." In response to this challenge, the four alleged discriminatees—which included Mr. Cartwright and Mr. Osterman, parties to the reprimands of Mr. Hypnar, and two of their co-workers—

1. It is uncontested that after Hypnar rejected employee Jernberg's request to discuss the morning's events, Hypnar responded negatively and turned to the rest of the employees adding, "If any of you guys think I can't run this plant without you, you can pack up your boxes and get out too."

proceeded to the time clock and punched out with Jolly.

The above evidence is a substantial demonstration that an atmosphere of contention and friction had arisen between Mr. Hypnar and the employees he supervised. It is sufficient, in my opinion, to support the Board's findings that the walkout of the four employees was meant to protest the tense and disagreeable relationship which had developed between the four employees and their supervisor.

Further, apart from any generalized dissatisfaction with Mr. Hypnar, the four alleged discriminatees had a right to engage in a peaceful work stoppage and walkout to protest the lawful firing of Mr. Jolly.[2]

While Section 7 of the National Labor Relations Act does not protect all concerted activities, it does protect "a strike designed to accomplish · * * * [the] reinstatement [of an employee who was 'properly discharged']" N.L.R.B. v. Phaostron Instrument & Electric Co., 344 F. 2d 855, 858–859 (9th Cir. 1965). Indeed, in N.L.R.B. v. Washington Aluminum, *supra,* 370 U.S. at 17, 82 S.Ct. 1099, Section 7 is said to protect all concerted activities which are not unlawful, violent, in breach of contract, or in violation of "any recognized standard of conduct." [3] I do not believe that a good faith peaceful protest by a group of workers of the firing of a co-worker, however justifiable that discharge may be, can be considered unlawful or disloyal activity or a violation of any "recognized standard of conduct" which the protesting workers owed to their employer. Their walkout was in direct response to a challenge by a representative of management and was effected without disturbing the rights of other workers or causing any additional commotion or violence. I believe it is

the intent of *Washington Aluminum* and Section 7 of the National Labor Relations Act to preserve the right of employees to undertake such concerted activities. *See* Hagopian & Sons, Inc. v. N.L.R.B., 395 F.2d 947, 951–953 (6th Cir. 1968); N.L.R.B. v. Pioneer Plastics Corp., 379 F.2d 301 (1st Cir. 1967) cert. denied 389 U.S. 929, 88 S.Ct. 292, 19 L.Ed.2d 281; N.L.R.B. v. Phaostron Instrument & Electric Co., 344 F.2d 855, 856–858 (9th Cir. 1965).

II. Management's Awareness that Four Employees had Engaged in a Concerted Walkout.

The majority finds there was not substantial evidence upon which the Board could find that management was aware of the fact that four employees had walked out to protest their contentious relations with their supervisor, or in the alternative, of the fact that the four employees had walked out to protest the firing of an employee without having an opportunity to discuss the provocations and tensions which had allegedly induced the first employee to strike his supervisor. I disagree.

Management was aware that Mr. Jolly had struck his supervisor and that some of the employees believed the supervisor's attitude provoked Mr. Jolly. And, in view of the lack of any formal grievance procedure, the supervisor's rebuff of a work leader's offer to discuss the morning's events and management's knowledge of those events, I believe that the "circumstances were such that it is only reasonable to infer that * * * [management] knew their [employees'] reason[s]' for walking out. N.L.R.B. v. Pioneer Plastics Corp., 379 F.2d 301, 307 (1st Cir. 1967) cert. denied 389 U.S. 929, 88 S.Ct. 292, 19 L.Ed.2d 281. *Cf.* N.L.R. B. v. Washington Aluminum Co., *supra.*

---

2. In no way, do I sanction Mr. Jolly's over-reacting to Mr. Hypnar's criticism by striking him. I suggest that Mr. Jolly's co-workers could have in good faith believed the punishment of firing was too severe in view of the alleged provocation by Mr. Hypnar.

3. This term was intended to include workers engaging in special tactics abhorrent to the purpose of the Act or unrelated to the labor policies in dispute. *See* National Labor Relations Board v. Electrical Workers, 346 U.S. 464, 74 S.Ct. 172, 98 L.Ed. 195 (1953).

To require that the protesting workers in the instant case present particularized demands upon a presumably fully cognizant management would frustrate the policy of the Act to protect the right of workers to act together to better their working conditions. N.L.R.B. v. Washington Aluminum, 370 U.S. at 14, 82 S.Ct. 1099. Hence, I would affirm the Board's finding that management could fairly be presumed to have known the general reasons for four of its workers engaging in a walkout.

### III. The Alleged Discriminatees Were Discharged And Denied Reinstatement.

The majority contends that the four alleged discriminatees were not constructively discharged by management when they attempted to return to work. I disagree.

The Trial Examiner, whose findings and determinations were affirmed by the Board, articulated several factors upon which he relied in finding that the four alleged discriminatees did not voluntarily quit, but were discharged by the Company. The most important factor arises from the circumstances surrounding the employees' required signing of the "tool clearance and quit slips." President Smith admitted that the purpose of those slips is to determine whether a man who is leaving has returned all of the Company's tools and only the signature of the tool cribman is actually necessary for a tool checkout. In view of the purpose of the tool clearance slips, management's insistence upon the signatures of the four employees on the "tool clearance slips"—bearing the legend "quit * * * walked off the job without authorization"—amounts to a constructive discharge of the four employees who signed them under protest in order to get their paychecks. Indeed, one of the slips did not even bear the signature of the tool cribman who was to clear the employees' tool boxes, but each of these slips was signed by Ferns, who presumably authorized or was responsible for the hand-written legend signifying that the employees "quit."

In addition, there was credited testimony that though no representative of management ever told the four discriminatees they were fired, their time cards were pulled from the time-check-in rack; that upon returning to work, they were forced to sign quit slips; and that none of the four were offered immediate reinstatement to their jobs.

I believe that the Trial Examiner and Board have made reasonable inferences from a series of factors requiring determinations of credibility and specialized knowledge of and experience with industry and labor practices. N.L.R.B. v. Phaostron Instrument & Electronics Co., *supra*, 344 F.2d 855; Keener Rubber, Inc. v. N.L.R.B., 326 F.2d 968, 970 (6th Cir. 1964) cert. denied 377 U.S. 934, 84 S.Ct. 1337, 12 L.Ed.2d 297; National Labor Relations Board v. Bendix Corp., 299 F.2d 308, 310 (6th Cir. 1962) cert. denied 371 U.S. 827, 83 S.Ct. 47, 9 L.Ed. 2d 65.

There being substantial evidence to support the Board's three basic factual findings—peaceful and concerted activity by a group of employees, awareness by management of their purpose, and discharge for such activity, the Board's order in this case should be enforced under the rationale of the *Washington Aluminum* case.