**ALLDATA CORPORATION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 00–1188.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 9, 2001.

Decided April 13, 2001.

Robert L. Rediger argued the cause and filed the briefs for petitioner.

Joan E. Hoyte–Hayes, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were Leonard R. Page, General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Frederick Havard, Supervisory Attorney. Julie B. Broido, Senior Attorney, entered an appearance.

Before: HENDERSON and RANDOLPH, Circuit Judges, and SILBERMAN, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge SILBERMAN.

SILBERMAN, Senior Circuit Judge:

Alldata Corporation petitions for review of the determination that it committed an unfair labor practice. The NLRB cross-petitions for enforcement. We grant the petition for review and deny the petition for enforcement.

## I.

Petitioner sells an automobile repair database to service stations. In May 1993, petitioner hired Karl Abbadessa to sell its products in Queens, New York, under the supervision of local field manager Arnold Pincus. Petitioner's salesmen were paid largely on commission. Company policy required that salesmen meet a quota of 7.5 sales per rolling quarter—*i.e.*, at the end of every month, each salesman must have met his quota for the previous three months. At the time of Abbadessa's hir-

ing, failure to meet the quota resulted in written warnings prior to discharge.

Abbadessa's tenure in petitioner's employ was tumultuous. In August 1994, Pincus fired Abbadessa over financial improprieties. Petitioner then nullified the firing and instead issued a written warning, which stated that Abbadessa needed to maintain his sales quota. By the end of fiscal year 1994, however, Abbadessa's sales placed him in the top 10% of petitioner's sales force. On April 11, 1995, petitioner informed Abbadessa that his fiscal year 1994 sales had earned him a trip to the "Winner's Circle," a company-funded trip to a California resort. Because the trip would allow him to meet petitioner's executives, Abbadessa spoke to other Alldata salesmen about their working conditions so that he might convey their concerns to management.

The primary concern among those in Abbadessa's region was their changing commission formula. Beginning in early 1994, petitioner adopted a second method for distributing its database: a contract with Snap–On Tools, a seller of automotive tools. Snap–On's sales force marketed the database to service stations, in competition with Alldata's own commission-driven salesmen. Among Abbadessa's fellow salesmen, this arrangement allegedly led to diminished earnings; without question, it led to resentment of Snap–On's role. Salesmen under Pincus' supervision, including Abbadessa, made their dissatisfaction known to Pincus at their monthly sales meetings. Pincus was not unsympathetic.

For Abbadessa, the Snap–On contract apparently led to both resentment and hostility toward Snap–On's employees. On May 10, 1995, Abbadessa was rejected for promotion because of his antagonistic relationship with Snap–On. After Pincus recommended two other salesmen for promotions, petitioner's vice president of sales, Robert Weiffenbach, suggested that he thought Abbadessa was "a better candidate." Pincus conceded that Abbadessa was a better candidate, but informed Weiffenbach that

I did not choose him because he has a poor reputation with [S]nap–[O]n. I feel this will negatively affect their cooperation with us.... I have attempted and am continuing efforts to bring upon an improvement in their relationships. Karl has been resisting making peace.

During the Winner's Circle, having been encouraged by Pincus to act as an "ambassador[ ]" for his fellow salesmen, Abbadessa approached Weiffenbach regarding his concerns and requested a meeting with Rod Georgiu, petitioner's president—which he got. Abbadessa spoke to Georgiu about various issues relating to employee well-being, including bonuses, expenses, reimbursement, and support. Abbadessa testified that Georgiu appeared sympathetic to his concerns and suggested that Abbadessa put his complaints in writing. Weiffenbach also urged Abbadessa to memorialize his concerns and to do so quickly. Abbadessa drafted a letter to Georgiu, which he had Pincus review, and sent it on May 23.

On June 5, petitioner decided to eliminate some salesmen who were well below quota. Weiffenbach wrote Pincus and the other field service managers:

In the next day or two I will be sending you a list of reps that need to be terminated immediately. Basically the list will include established reps that are below 2 or 3 units YTD [i.e., since March 31]. Each of you has a rep or two in this category and this performance can not be allowed to continue this year. There is absolutely no excuse for an established rep not to be above quota.

This policy constituted a change from petitioner's previous one of issuing written warnings to those who were below quota.

On June 12, Abbadessa e-mailed Weiffenbach to suggest that "we draw up an 'agreement' which clearly states what the [Snap–On] dealers['] obligations are, ... and have any dealer who is interested in participating sign." Abbadessa apparently also submitted his own draft of such an agreement. The next day, Pincus offered two candidates who were under his supervision for termination. He told Weiffenbach that neither Abbadessa nor Alan Tankoos, another salesman, qualified for retention, because they each had secured only two of the requisite 7.5 sales, despite the fact that the rolling quarter within which those sales had to be made was almost five-sixths over. Pincus stated that "[i]f [Abbadessa's] business doesn't improve he may be my first choice to go."

The following day Weiffenbach angrily responded to Abbadessa's June 12 e-mail:

I read the document you intended to try and get the dealers to sign. Frankly I went a little ballistic. I have one statement I want you to think about. What makes you think you have the authority and/or rapport with Snap–on to ask or require them to sign this unauthorized document? ! Karl, you need to put your adversarial attitude about Snap–on in the closet and leave it there. They do not work for you or [me] and your heavy handed tactics will only serve to further damage the relation. You can be certain I will not allow that to happen. I am working hard to get their entire organization behind us ....

Abbadessa wrote back on June 20 assuring Weiffenbach that he had taken no direct action to get Snap–On dealers' signatures.

The same day, Weiffenbach e-mailed Abbadessa to notify him that his Winner's Circle status earned him 600 "stock option shares." The message congratulated Abbadessa on his sales success during the preceding fiscal year.

Three days later, Pincus terminated Abbadessa's employment for "failure to maintain sales volume." Pincus wrote to Abbadessa stating that Abbadessa had net sales of only two units with a week left in the rolling quarter—well short of the required 7.5—and that another possible cancellation threatened to reduce Abbadessa's total to a single sale. Therefore, according to Pincus' letter, petitioner had "no alternative but to terminate [Abbadessa's] employment immediately, effective June 23, 1995." However, field managers other than Pincus did not begin cutting personnel, pursuant to Weiffenbach's memorandum, until September of that year. Only then was Tankoos released.

With Abbadessa's June 23 firing, the clock began running on the six-month statute of limitations for filing an unfair labor practice charge under § 10(b) of the National Labor Relations Act.[1] When Abbadessa finally attempted to file a charge on December 18—five days before the statute of limitations was up—he did so without attaching the jurat or declaration required by NLRB regulations.[2] At the time much of the federal government, including the Regional Offices of the National Labor Relations Board, was shut down due to a budget deadlock. After the offices reopened, on January 8—after the statute of limitations had run—the Region-

---

1. 29 U.S.C. § 160(b).

2. *See* 29 C.F.R. § 102.11. That is, Abbadessa failed to include either his signature as witnessed by a notary public or a declaration under penalty of perjury that the contents of the charge were true and correct. *See id.*

al Office requested that Abbadessa refile his charge in the proper form and deferred for later consideration whether the refiled charge would be considered timely. Abbadessa promptly refiled.

An administrative law judge found that Abbadessa's meeting with and letter to Georgiu constituted protected concerted activity under § 7 of the Act, and inferred that Abbadessa's termination was brought on by that concerted activity. After making those findings, however, the ALJ dismissed the complaint because he believed that the untimely filing of the sworn charge meant that no valid charge was filed. The Board disagreed, holding that "the failure of a charging party to comply with the jurat or declaration requirement does not affect the timeliness of the filing of an unfair labor practice charge." The Board determined, however, that the ALJ's decision was insufficiently specific to allow meaningful review, and so it remanded for specific findings regarding the elements of the unfair labor practice and witnesses' credibility.[3]

On remand, the ALJ made a credibility finding as to only one topic but otherwise fleshed out his previous findings regarding the unfair labor practice. Over a strong dissent, the Board adopted the ALJ's order and decision.[4] Alldata petitioned for review and the Board cross-petitioned for enforcement.

## II.

Petitioner presents us with two arguments. First, it is contended that an unsworn charge is no charge at all and that by the very terms of the Board's own regulations Abbadessa's charge was untimely. Second, petitioner, echoing the dissenting Board member, argues that substantial evidence is lacking for the Board's finding that petitioner acted on the basis of animus against concerted activity. We take up those arguments in order.

### A.

■ The Board's regulations require that a charge contain either a jurat or a declaration. Petitioner argues that noncompliance with the jurat requirement invalidates a charge and that failure to file a valid charge within the six-month period renders a subsequent charge untimely. The Board decided, however, that the defective charge's filing tolled the statute of limitations, and that "[a] charge timely filed within the 10(b) period remains timely pending its revision to comply with this provision of the Board's Rules." 324 N.L.R.B. at 545. We give controlling weight to the Board's interpretation of its own rule unless it is plainly erroneous or inconsistent with the regulation itself. *See Canadian Am. Oil Co. v. NLRB*, 82 F.3d 469, 473 (D.C.Cir.1996). Here, we see no reason not to defer to the Board's interpretation. While § 102.11 requires that a charge "shall" contain a jurat or declaration, the consequence of a charge's noncompliance on its timeliness is not mentioned. If the agency allows a statutorily valid charge filed within the statutory period to be subsequently brought into compliance with agency specifications, there is nothing "plainly erroneous or inconsistent" with the text of the regulation about doing so.

### B.

■ It is, of course, axiomatic that the Board's unfair labor practice determination must be premised on a finding that

---

3. *Alldata Corp.*, 324 N.L.R.B. 544, 545 (1997).

4. *Alldata Corp.*, 327 N.L.R.B. 127, 127 (1998).

petitioner was motivated by animus against Abbadessa's concerted activity. And Abbadessa's efforts to improve the pay and working conditions of his fellow salesmen were protected activity. But petitioner claims that there is not a shred of evidence that the company resented Abbadessa's concerted activity—at least insofar as it remained within legitimate scope and bounds. In fact, the company encouraged Abbadessa's role.

The Board's finding, not atypically explained in a footnote to the Board's opinion, is based on inferences it draws from certain circumstances:

> the timing of the discharge in that it occurred shortly after Abbadessa's voicing of employee complaints about [petitioner's] bonus policy, expense reimbursement, sales support and other issues; the disparity in [petitioner's] treatment of Abbadessa and other underperforming sales people; and the inconsistency between commending and rewarding Abbadessa for his sales performance and then shortly thereafter firing him for alleged poor performance.

327 N.L.R.B. at 127 n. 2.

That sort of circumstantial evidence, when combined with some evidence of employer animus directed at an employee's protected activity, would ordinarily suffice to support a Board finding of illegal discharge. But it is doubtful that it would suffice without that crucial link. Cf. *MECO Corp. v. NLRB*, 986 F.2d 1434, 1437 (D.C.Cir.1993).

In any event, the Board's description of the circumstantial evidence in this case ignores other circumstances which wholly undermine its finding of unlawful motivation. Taking the last point first, there is no logical inconsistency in the company's behavior in discharging Abbadessa for poor performance shortly after giving him a reward, because the reward was for his performance in the prior year, fiscal 1994, whereas his performance in early fiscal 1995 was below company standards.

To be sure, turning to the timing, Abbadessa was discharged before the group of firings Weiffenbach contemplated—which did not come until September. The Board particularly was struck by the fact that Tankoos, who like Abbadessa had only two net sales for the rolling quarter, was not discharged until September. At the time Abbadessa was let go, however, Tankoos, unlike Abbadessa, had four potential sales in the pipeline, whereas Abbadessa was not making a comparable effort.[5]

Still it is a fair observation that the timing of Abbadessa's discharge was suspiciously abrupt coming even before the end of the quarter. But the Board (and the ALJ) ignored Abbadessa's extraordinary drafting and sending to Weiffenbach of the proposed new agreement with Snap–On. In the context of Abbadessa's troubled relations with Snap–On employees it is quite apparent that Abbadessa's initiative did engender animus, even fury. Weiffenbach wrote Abbadessa that he, Weiffenbach, "went ballistic" when he received that communication only days before Abbadessa was discharged. The Board's counsel conceded Abbadessa's efforts to directly influence Alldata's contractual relations with Snap–On went beyond any reasonable definition of protected concerted activity yet neither the ALJ nor the Board even

---

5. The ALJ refused to credit Pincus' testimony that he had pled with Abbadessa to increase his sales efforts because there was no written record of those pleas. The Board implies that Abbadessa's unwarned firing, coupled with petitioner's prior policy of issuing written warnings, suggests improper motivation. But Weiffenbach's June 5 memo plainly changed that policy for the whole company.

discussed its relevance.[6] Abbadessa's ploy, coming in the wake of his troubled relations with Snap–On employees, may well have pushed him to the front of the queue of marginal employees, but it constitutes a non-protected ground for discharge.

We agree with the dissenting Board member that there is simply no evidence that petitioner ever manifested any hostility to Abbadessa's protected concerted activity. Abbadessa was encouraged by his supervisors, Pincus and Weiffenbach, to present his and his fellow salesmen's compensation concerns to Georgiu both orally and in writing (Pincus even helped Abbadessa to draft a letter to Georgiu). Abbadessa went too far, however; he took his advocacy role beyond protected bounds and, assuming that initiative in part contributed to the timing of his discharge— which is a fair inference—it nevertheless does not support the Board's finding of unlawful motive. The Board just flatly ignored the obvious superseding (and benign) explanation for the abruptness of Abbadessa's discharge and instead fixed on an unsupported cause. As such, its inference drawn from the circumstances is unreasonable. *See Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 366–67, 118 S.Ct. 818, 139 L.Ed.2d 797 (1998); *see also Southwest Merch. Corp. v. NLRB*, 943 F.2d 1354, 1360 (D.C.Cir.1991).

\* \* \*

Accordingly, the petition for review is granted.

*So ordered.*

---

**6.** To be sure, petitioner did not make this point very effectively.