Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports.  Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 19, 2005      Decided December 16, 2005

No. 04-1317

CITIZENS INVESTMENT SERVICES CORPORATION,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

———

Consolidated with
No. 04-1334

———

On Petition for Review and Cross-Application for
Enforcement of an Order of the
National Labor Relations Board

———

*James P. Hollihan* argued the cause and filed the briefs for petitioner.  *Burton J. Fishman* entered an appearance.

*Christopher W. Young*, Attorney, National Labor Relations Board, argued the cause for respondent.  With him on the brief

were *Arthur F. Rosenfeld*, General Counsel, *John H. Ferguson*, Assistant General Counsel, *Aileen A. Armstrong*, Deputy Associate General Counsel, and *Meredith L. Jason*, Attorney.

Before: HENDERSON, ROGERS and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

Concurring opinion filed by Circuit Judge HENDERSON.

ROGERS, *Circuit Judge*: The only question in this appeal is whether substantial evidence on the record considered as a whole supports the finding of the National Labor Relations Board that Citizens Investment Services Corporation ("the Company") violated section 8(a)(1) of the National Labor Relations Act ("the Act"), 29 U.S.C. § 158(a)(1) (2000), by discharging financial consultant Christopher Hayward because of his protected concerted activity of protesting compensation terms and payments for financial consultants. Because there is substantial evidence, and consistent with our limited scope of review, we deny the Company's petition for review and grant the Board's cross-petition for enforcement.

**I.**

Section 7 of the Act, 29 U.S.C. § 157, guarantees employees the right to engage in "concerted activities" not only for self-organization but also "for the purpose of . . . mutual aid or protection . . . ." The broad protection of Section 7 applies with particular force to unorganized employees who, because they have no designated bargaining representative, must "speak for themselves as best they [can]." *NLRB v. Washington Aluminum Co.*, 370 U.S. 9, 14 (1962).

The right to engage in concerted activities is protected by

Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), which makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [S]ection 7." Accordingly, an employer violates Section 8(a)(1) by discharging an employee for engaging in concerted activities protected by the Act. *Gold Coast Rest. Corp. v. NLRB*, 995 F.2d 257, 263-64 (D.C. Cir. 1994).

The events at issue followed a change in ownership and management of a financial services company. In 2001, Citizens Financial Group ("Citizens") acquired the commercial banking operations of Mellon Bank, N.A., including the brokerage and investment counseling business of a subsidiary of Mellon, Dreyfus Investment Services Corporation ("Dreyfus"). Citizens created a subsidiary, the Company, in order to house the business acquired from Dreyfus and Mellon. During the acquisition, Citizens offered certain Dreyfus financial consultants employment at the Company. During the negotiations with the Dreyfus financial consultants in October 2001, Dreyfus proposed commission terms that were less favorable to experienced financial consultants than those originally proposed in September 2001. Certain experienced Dreyfus consultants complained about the changes immediately. Christopher Hayward, who had worked for Dreyfus for six years and who was involved in these complaints, nonetheless accepted employment with the Company. In January 2002, the Company distributed a final commission schedule that included relatively unfavorable terms for more experienced financial consultants. By April 2002, Hayward also began to complain that commissions were not being correctly calculated based upon the schedule. Hayward was discharged on July 2, 2002. The decision to discharge him was made by John Halechko (a Senior Vice President and Director of Investment Sales), Eric Hosie (a Regional Sales Manager in an adjacent territory), Barbara Blyth (a Human Resources Group Manager for Citizens), and David

Hunter (the Regional Sales Manager for the Pittsburgh area).

Based on a charge filed by Hayward alleging that he was terminated as a result of his protected concerted activities, the General Counsel to the Board filed a complaint alleging that the Company, as a result of interfering with the exercise of Section 7 rights, had violated Section 8(a)(1) of the Act. The Administrative Law Judge ("ALJ") found that the Company had violated Section 8(a)(1) and ordered that Hayward be reinstated or offered a position commensurate with his prior position, that any unfavorable references to the discharge be removed from Hayward's personnel files, and that Hayward be made whole for any losses that he suffered as a result of his unlawful discharge. The Board affirmed, as relevant, the findings and order of the ALJ, and the Company petitions for review.

## II.

The Company challenges the Board's findings at each step of the analysis under *Wright Line*, 251 N.L.R.B. 1083 (1980), *enforced*, 662 F.2d 899 (1st Cir. 1981). Under *Wright Line*, the General Counsel must make a prima facie showing sufficient to support the inference that the employee is engaged in protected conduct and the employer was so aware, and that the protected activity was a motivating factor in the employer's decision to take adverse action; the employer may rebut the inference by showing by a preponderance of evidence that the same action would have taken place even in the absence of the protected conduct. *Laro Maint. Corp. v. NLRB*, 56 F.3d 224, 228 (D.C. Cir. 1995); *see NLRB v. Transp. Mgmt. Corp.* 462 U.S. 393, 401-03 (1983).

The Company makes no reference in its briefs to our standard of review, which is limited. Determining whether activity is concerted and protected within the meaning of Section 7 is a task that "implicates [the Board's] expertise in

labor relations." *NLRB v. City Disposal Sys., Inc.*, 465 U.S. 822, 829 (1984). The Board's determination that an employee has engaged in protected concerted activity is entitled to considerable deference if it is reasonable. *Id.* The Board's determination of questions of motive is "give[n] even greater deference" by the court. *Frazier Indus. Co. v. NLRB*, 213 F.3d 750, 756 (D.C. Cir. 2000); *see Laro*, 56 F.3d at 229. The Board's findings of fact, if supported by substantial evidence on the record considered as a whole, are conclusive even if a reviewing court on *de novo* review would reach a different result. *United Servs. Auto. Ass'n v. NLRB*, 387 F.3d 908, 913 (D.C. Cir. 2004). The court will not overturn the Board's acceptance of an ALJ's resolution of conflicting testimony unless the ALJ's determinations are "hopelessly incredible" or "self-contradictory." *Teamsters Local Union No. 171 v. NLRB*, 863 F.2d 946, 953 (D.C. Cir. 1988) (quoting *Conair Corp. v NLRB*, 721 F.2d 1355, 1368 (D.C. Cir. 1983)). Thus, the "Board is to be reversed only when the record is 'so compelling that no reasonable factfinder could fail to find' to the contrary." *United Steelworkers of Am. Local 14534 v. NLRB*, 983 F.2d 240, 244 (D.C. 1993) (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 484 (1992)).

## A.

The Company acknowledges that under *Meyers Industries Inc.*, 281 N.L.R.B. 882, *aff'd sub nom Prill v. NLRB*, 835 F.2d 1481 (D.C. Cir. 1987), concerted activity may be found when an employee's activity is undertaken with or on the authority of other employees, and not solely on behalf of the employee himself. Thus, concerted activity includes circumstances where individual employees work to initiate, induce or prepare for group action. *United Servs. Auto. Ass'n*, 387 F.3d at 914. Similarly, an individual "who brings a group complaint to the attention of management is engaged in concerted activity even though he was not designated or authorized to be a spokesman

by the group." *Prill v. NLRB*, 755 F.2d 941, 954 (D.C. Cir. 1985).

The Company maintains that there is "no evidence . . . that Hayward [acted] based on authorization from other employees" and "no evidence suggests that . . . discussions [at group meetings] took the form of group 'complaints' or protests," as opposed to individual inquiries about the status of delayed payments. Petitioner's Br. at 14. There also is, the Company maintains, "no evidence that the group nature of these discussions [about compensation issues] was ever communicated to management." *Id.* at 15-16. To reach these conclusions, however, the Company ignores the evidence before the Board with regard to the discussions following its distributions of several drafts of its FY 2002 incentive plan for financial consultants.

We do not think it can seriously be questioned that there was substantial evidence Hayward was engaged in protected concerted activity. Citizens distributed several versions of its compensation plans and certain senior financial consultants, including Hayward, responded to the management at Citizens and then the Company with critical comments about the compensation for senior financial consultants. Hayward and other senior financial consultants also complained about the accuracy of the Company's calculation of their own commission payments. Such complaints are plainly protected. *See Eastex, Inc. v. NLRB*, 437 U.S. 556, 569 (1978). The evidence also showed that Hayward engaged in two types of concerted activity: individual acts taken in order to bring the complaints of the group of experienced financial consultants to the Company's management, *see Phillips Petroleum Co.*, 339 N.L.R.B. No. 111, 2003 WL 21802939, at *3 (2003), and group activities designed to advance the interests of these consultants. The first is evident in Hayward's April 2002 email to Halechko regarding the

payment of certain commissions and reporting on "the general consensus" among his fellow employees, and in Hayward's June 6 email to Hunter which he signed as "union president." Whether a joke or not, the reference to "union president" indicates that Hayward was representing the collective view. The second is evident in his conduct at the Company's quarterly business meeting when, on behalf of the group, Hayward invited the Human Resources Group Manager Blyth to join them at the table where the senior financial consultants were sitting to discuss compensation problems, and at Regional Sales Manager Hunter's monthly meetings, where Hayward repeatedly raised compensation issues.

Further, the evidence shows management at various levels was aware of Hayward's participation and would, especially in light of Hayward's vocal complaints during group meetings, have understood his participation to be associated with the group's common concerns. *See NRLB v. Talsol Corp.*, 155 F.3d 785, 791, 796-97 (6th Cir. 1998); *El Gran Combo de Puerto Rico v. NLRB*, 853 F.2d 996, 1003, 1005 (1st Cir. 1988); *Rockwell Int'l Corp. v. NLRB*, 814 F.2d 1530, 1535 (11th Cir. 1987). Halechko acknowledged that issues raised in the emails of Edward Chess Jr., Hayward's co-worker, which also were voiced by Hayward, were "valid and important to many of your peers," and asked that Chess "elaborate on what other decisions being made are becoming dissatisfiers [sic] for the group." After Hayward asked Blyth to sit with the senior financial consultants at the Company's quarterly dinner meeting and suggested that he might follow up with her at a later time, she told Hunter that he "had some very unhappy [financial consultants] . . . in how they're being paid."

**B.**

Whether a discharge violates Section 8(a)(1) depends on the employer's motive. The Company contends that the Board's

finding that Hayward's discharge was unlawfully motivated improperly substitutes the Board's business judgment for that of Company management. As the Company views the evidence, Hayward engaged in a course of conduct that challenged the authority of management to implement philosophical and organizational changes in the manner in which the Company marketed its financial consulting services. In what it describes as undisputed evidence, the Company claims that (1) Hayward openly denigrated the skills and qualifications of newly-hired financial consultants, (2) openly criticized the integrity and management structure at the Company, and (3) eagerly scheduled meetings when called by the manager of another district to make a sale outside of Hayward's geographic territory (a practice the Company refers to as "poaching") in conjunction with denigrating a junior financial consultant who was unable to complete the sale. Regarding its affirmative defense, the Company maintains that the Board wrongly dismissed, in a superficial manner, the reasons articulated by the Company for its decision to discharge Hayward based on the ALJ's faulty view that Hayward's objectionable conduct was simply not serious enough to justify terminating the employment of one of the Company's leading producers. For example, the Company — asserting without evidentiary support that Hayward was a Vice President with responsibility for mentoring junior employees — takes issue with the ALJ's evaluation of the seriousness of Hayward's statement to a junior financial consultant suggesting that only sycophants will get ahead in the new organization.

Although we acknowledge that the question of motive presents a close question, "much of the conflict about what was said and what could reasonably be understood in the context of what had previously happened [would] cal[l] for credibility determinations that this court is ill-positioned to second-guess," *W.C. McQuaide, Inc. v. NLRB*, 133 F.3d 47, 53 (D.C. Cir. 1998),

or would necessarily implicate the Board's expertise in drawing reasonable inferences from the evidence to make a determination about an employer's motive, and so merit the court's deference. The Company points to certain evidence in the record to support its interpretation of events. Contrary to the Company's contentions, however, an examination of the evidence before the Board reveals that there was substantial evidence that Hayward was not the only person in his position who criticized the newly hired financial consultants or openly criticized the Company's management structure. Such evidence included evidence that in handling accounts outside of his geographic district, Hayward neither initiated nor acted contrary to Company policy but obtained the necessary approvals. Moreover, at no time throughout his course of conduct, identified by the Company as the reason for his discharge, did the Company impose any discipline on Hayward, who remained one of its top producers. Instead of being disciplined under the progressive disciplinary measures as called for by the Company's employee manual, Hayward was discharged. Where there is substantial evidence, the court must defer to the Board's findings.

The evidence before the Board indicates that the principal concern of the senior financial consultants was the structure of the Company's incentive compensation plan, particularly its failure to provide for trail payments, i.e., commissions paid to consultants for ongoing management of investments originally purchased in prior years. In determining the Company's motivation for discharging Hayward, the Board looked to direct evidence from which it inferred that the Company took a dim view of the consultants' complaints about that plan. It pointed to Halechko's response to Chess's October 2001 email, which stated that Halechko was open to financial consultants' suggestions as long as they were framed in a manner that didn't "piss [him] off"; to financial consultant Jeffrey Russo's

testimony, which the ALJ credited, that the supervisors expressed exasperation about the complaints and that Hosie told Russo that the Company's concern about Russo's future with the Company stemmed from Russo's "complaining about compensation and the trails and everything else," that Hayward complained a lot as well, and that he, Hosie, was in place to "fix or get rid of the problem"; and to Hunter's testimony drawing "the direct connection between Hayward's concerted activity with his peers and the Company's animus against him." Other direct evidence supported the inference drawn by the Board regarding management's attitude, specifically, Hayward's testimony, which the ALJ credited, regarding Blyth's uncomfortable reaction to Hayward's invitation to speak informally to the senior financial consultants about their complaints at the quarterly company dinner; the Board observed that Hayward's account of Blyth's reaction, which Hayward paraphrased as "this doesn't look good, me talking to you guys," reflected her "awareness that management considered the experienced consultants to be pariahs due to their complaints."

Although the Company contends the evidence shows that management was open to receiving criticisms about its compensation plan, and there is such evidence, as noted, this is not the same as showing that there was not substantial evidence to support the inferences drawn by the Board. The problems in transition may have exacerbated the situation for the Company, which claimed it had to rely on Dreyfus for information relating to individual compensation, but this does not explain what the Board characterized as the tone of the Company's responses to expressions of concern about the structure of the compensation plan itself.

In addition, the Board relied on circumstantial evidence of the type that the Board has previously considered highly probative, namely, the failure to follow the Company's formal

disciplinary process, which called for progressive discipline and was outlined in the employee handbook, and the timing of Hayward's discharge. A failure to use the progressive discipline system supports the inference of unlawful motive. *See SCA Tissue N. Am. LLC v. NLRB*, 371 F.3d 983, 991 (7th Cir. 2004); *NLRB v. Dynatron/Bondo Corp.*, 176 F.3d 1310, 1321 (11th Cir. 1999). There was substantial evidence regarding the discriminatory manner in which the Company dealt with Hayward as compared to other complainers, such as Chess and Russo, who were not discharged even though there were not substantial differences in the nature of the employees' complaints. *See Laro*, 56 F.3d at 230; *Gold Coast Rest. Corp.*, 995 F.2d at 264-65. Chess, like Hayward, was critical of management as well as the terms of the Company's proposal to split the commissions between junior and senior financial consultants. Russo, like Hayward, spoke out at the monthly meetings about the errors in his commission checks. Yet only Hayward was discharged. *See MECO Corp. v. NLRB*, 986 F.2d 1434, 1437 (D.C. Cir. 1993).

Although the Company suggests that Hayward was not a candidate for corrective action because he had been repeatedly warned and failed to change his conduct, the Board could reasonably decide not to credit this evidence. Hunter testified that he warned Hayward informally about the tone of his complaints and his activities in response to requests for assistance from a branch outside of his geographic district. The Board observed that "none of the purported admonitions is documented in any way" and explained that crediting Hunter's testimony would show only admonitions of the type that "would form a component of virtually every employment relationship," as there are no perfect employees. Taking issue with the Board's assessment of the seriousness of Hayward's conduct, the Company offers no explanation for the fact that conduct it now maintains was serious enough to cause the discharge of a

highly productive employee was not, at the time, serious enough to trigger the procedures indicated in the employee handbook, whereby the employee's alleged breaches of business decorum would be documented in the form of a written Performance Improvement Plan. There is no evidence to support the Company's assertion that Hayward was, as a Vice President and a member of management, not subject to the handbook.

The timing of Hayward's discharge also supports the Board's finding of unlawful motive. The Company discharged him two weeks after he had identified himself as "union president" in an email to Hunter. The Company's argument that only Hunter saw the email and he was no longer Hayward's supervisor ignores that Hunter participated in the conference during which the decision to discharge Hayward was made, and that Hunter's recommendation of discharge was based, at least in part, on Hayward's complaints about the compensation issue. *See Tasty Baking Co. v. NLRB*, 254 F.3d 114, 125-26 (D.C. Cir. 2001); *Reno Hilton Resorts v. NLRB*, 196 F.3d 1275, 1283 (D.C. Cir. 1999).

Finally, there was substantial evidence to support the Board's conclusion that the Company's affirmative defenses were merely pretextual excuses. The Board has explained that the lack of clarity and consistency in explaining reasons for termination is an important factor in evaluating the proffered justifications, and that "when an employer vacillates in offering a rational and consistent account of its actions, an inference may be drawn that the real reason for its conduct is not among those asserted." *Black Entm't Television*, 324 N.L.R.B. 1161, 1161 (1997) (quoting *Sound One Corp.*, 317 N.L.R.B. 854, 858 (1995)). The evidence of the Company's explanations for Hayward's discharge — that he had acted unethically by poaching sales and that he was a troublemaker and not a team player — "hardly constitute[s] the showing that [the employer]

must make" in order to meet its burden to show it would have discharged Hayward regardless of his protected concerted conduct. *O'Dovero v. NLRB*, 193 F.3d 532, 537 (D.C Cir. 1999).

The Board observed that Hayward was not given a formal written statement of the reasons for his discharge and that the testimony of the managers left the question unclear as each manager emphasized his or her own chosen factors. For example, Blyth alone mentioned Hayward assigning accounts to himself, and Hosie was the only one to mention Hayward's disparagement of fixed annuities as evidence Hayward was disrespectful of the Company's products. The Board pointed to Hayward's uncontroverted testimony regarding his final meeting with management as the best illustration of the lack of clarity or precision in the Company's explanations. At that time, Blyth said Hayward was being fired because of his poaching, while Hosie and Halechko said it was because he did not fit in and was not a team player.

Neither explanation, the Board could reasonably conclude, is persuasive. The Company presented the testimony of Halechko that poaching was unethical. Nevertheless, the Company took no disciplinary action against Hayward although its management was informed of the pertinent details and Hayward, who did not initiate either transaction, had made no effort to conceal the reasons Company managers brought him in to make the sales. Hence, the Board reasonably could discredit the Company's contention that it considered the poaching to be serious unethical conduct that played a critical role in the decision to discharge Hayward. Although the Company objects that the Board is interfering with its business judgments, the evidence showed that the Company failed to take action consistent with its claim that Hayward's conduct was a serious breach of ethics. The court cannot conclude that the Board's

resolution of the conflicting evidence, in rejecting assertions that Hayward acted unethically as not credible and a "tardily formulated attempt to justify Hayward's discharge," was "hopelessly incredible or self-contradictory." *See Teamsters Local 171*, 863 F.2d at 953 (quotations and citations omitted).

As to the Company's defense that Hayward was discharged because he was a troublemaker and not a team player, Board precedent has recognized that if management perceives pressing protected complaints in front of other employees as "making trouble," this attitude "supports the inference that the Company discharged [the employee] for engaging in concerted activities." *Dayton Typographical Serv. v. NLRB*, 778 F.2d 1188, 1193 (6th Cir. 1985). Here, the Board found such an inference. It rejected the Company's contention that its discharge of Hayward was justified by Hayward's disruptive behavior and attitudinal problems, which the Company claims were interfering with the efforts to build a team atmosphere among the financial consultants, as "simply another way of indicating that he was terminated because he engaged in protected concerted activity when he persistently complained about the structure of the compensation plan and the manner in which compensation was actually being paid under that plan."

Although the Board credited the managers' description of the new working environment, there was substantial evidence, as the Board found, that this proved too much. Accepting the testimony of Halechko, Hunter, and Hosie that Hayward's conduct and comments were undermining the team operation that the Company sought to build, the evidence showed that both Hosie and Hunter agreed that the financial consultants' relationships with bank managers were of critical importance and that Hayward had no problems with them. Halechko's testimony was not to the contrary. The evidence did show that Hayward criticized newer financial consultants, but that he was

one of a number of senior financial consultants who were critical, and Halechko acknowledged that Hayward was not a ring leader in this problem. The Board could reasonably conclude that the evidence failed persuasively to demonstrate that Hayward's bad attitude was a motivating factor in Hayward's dismissal. Whether a court, upon *de novo* review, would reach the same conclusion, is irrelevant. When viewed in light of Hayward's prominent and persistent involvement in protected concerted activity, the Board determined, in the exercise of its expertise in evaluating such claims, that the Company's abrupt termination of an outstanding producer with no prior disciplinary record is more comprehensible as an effort to punish Hayward for his protected concerted activities. Again, the Board's resolution of credibility in concluding that the Company's reasons were pretextual was not "hopelessly incredible or self-contradictory." *Teamsters Local 171*, 863 F.2d at 953 (quotations and citations omitted).

Neither *Epilepsy Foundation of Northeastern Ohio v. NLRB*, 268 F.3d 1095, 1105 (D.C. Cir. 2001), *Alldata Corp. v. NLRB*, 245 F.3d 803 (D.C. Cir. 2001), nor the cases from the Eighth Circuit on which the Company relies are of particular help to the Company. Neither of the cases from this circuit involved protected activity, and, in each, the court concluded there was no evidence to support the Board's position. *Epilepsy*, 268 F.3d at 1105; *Alldata*, 245 F.3d at 809. The same cannot be said here. Similarly *St. Lukes Episcopal-Presbyterian Hospitals, Inc. v. NLRB*, 268 F.3d 575, 579-81 (8th Cir. 2001), did not involve protected activity, and in *Carleton College v. NLRB*, 230 F.3d 1075 (8th Cir. 2000), the Board did not find that the employer's affirmative defense was pretextual, *id.* at 1077, but instead erroneously reasoned, the court held, that unprofessional insubordination could not become the proper foundation of an affirmative defense if such behavior arose in the context of an employee's other protected activity, *id.* at 1080-81.

The Company, in contending that the Board has displaced its lawful business judgment with regard to its proffered affirmative defense, emphasizes and credits aspects of the evidence that the Board did not emphasize and did not credit. Because it is not the role of the court to second-guess the Board's evaluation of the evidence, we conclude, in light of the substantial evidence on the record considered as a whole, that the Company fails to demonstrate that the Board could not have reasonably rejected the Company's account of its motivations. *See Teamsters Local 171*, 863 F.2d at 953. Accordingly, because there was substantial evidence to support the Board's finding that Hayward's protected concerted activity was a motivating factor in the Company's decision to discharge him, we deny the petition for review and grant the cross-petition for enforcement.

KAREN LeCRAFT HENDERSON, *Circuit Judge*, concurring:

I join the majority opinion but do so with reluctance because this case is much closer than my colleagues acknowledge. While we must uphold the Board's factual findings "if supported by substantial evidence on the *record considered as a whole*," *Regal Cinemas, Inc. v. NLRB*, 317 F.3d 300, 306-307 (D.C. Cir. 2003) (quoting 29 U.S.C. § 160(e) (emphasis added)), I believe the full discharge of our duty to review the *whole* record results in a squeaker even under this deferential standard of review.[1]

The evidence supporting Citizens Investment's affirmative defense—that it would have discharged Hayward in the absence of any protected concerted activity—is illustrative. The Board considered the two reasons Citizens Investment advanced for Hayward's termination: to wit, "two specific instances of asserted misconduct"—both involving poaching clients—and "a generalized allegation that Hayward had a bad attitude and was not a team player." J.A. 22. It found Citizens Investment's first rationale—the two instances in which Hayward poached sales outside his territory—pretextual because, in its view, management was "not seriously perturbed" "at the time th[ese] incident[s] took place," management failed to discipline Hayward as a result and "logic and common sense lead to a firm conclusion that Hayward's conduct was in no way objectionable." J.A. 23.

The Board dismissed the fact that the members of management involved in the decision to terminate Hayward testified that the two poaching incidents played a significant role in their decision. For instance, John Halechko testified that his decision to recommend that Hayward be terminated

---

[1] The U.S. Supreme Court articulated this now-bedrock principle of administrative law in *Universal Camera Corp v. NLRB*, 340 U.S. 474, 488 (1951), in which the Court stated: "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. This is clearly the significance of the requirement . . . that courts consider the whole record."

was based on, *inter alia*, Hayward's transacting business in other financial consultants' territories. J.A. 391-92. Eric Hosie, whose recommendation that Hayward be terminated was based on his one-on-one conversations with Hayward, testified that, as a result of their conversations, he believed that Hayward was not a "team player." J.A. 548. His contemporaneous notes from a meeting with Hayward in May 2002, two months before Hayward was terminated, recited that Hayward appeared "willing to circumvent colleagues and tell me it is because he is better—teamwork." J.A. 714. Barbara Blyth attended the meeting at which the decision was made to terminate Hayward and testified that the decision was "primarily" based on the fact that he "cross[ed] into other individuals' territories." J.A. 589-90. Her contemporaneous notes from the meeting listed among the reasons for Hayward's termination "racist client," a reference to one of the instances in which he made a sale outside his assigned territory. J.A. 715.

Second, the Board concluded that Citizens Investment's "generalized allegation" that Hayward had a bad attitude and was not a team player was pretextual. Its conclusion was drawn from evidence that Hayward was not alone in his criticism of Citizens Investment's change in business direction and his denigration of junior financial consultants and, further, from its assessment that Hayward's attitude was no worse than that of other senior financial consultants. The Board based this finding on two pieces of evidence: first, only Chess, another senior financial consultant, complained to management about newly hired financial consultants; and, second, Halechko testified that Hayward was not the "ring leader" of the senior consultants in belittling their juniors. J.A. 24. Regarding the former, the Board missed the point that Hayward's attitude problem did not involve complaints to management about junior consultants but rather about his giving the new hires the cold shoulder and undermining their

abilities, *see* J.A. 392, 548, 590, and about his challenging management's new business focus. *See* J.A. 463-64. And the Board mischaracterized the latter. Halechko responded "no" to counsel's question whether Hayward was the "ring leader" in "not respecting newly hired, more junior financial consultants," J.A. 433-34—he did not testify to Hayward's undercutting senior management by questioning Citizens Investment's business decisions, as the Board erroneously found. J.A. 24.

A review of the *whole* record, however, manifests that Hayward's attitude was in fact worse than that of other senior financial consultants. Eric Hosie testified about Hayward's inappropriate conduct and denigrating comments. He stated that Hayward told him that Saunders and Kennedy, two junior consultants, were not qualified to be financial consultants. He testified that Hayward used the two poaching incidents as examples of Saunders's ineptitude as a financial consultant. J.A. 530. Hosie's notes of his May 2002 conversation with Hayward indicated that Hayward had "[c]rossed from troubleshooter to maker—should help [junior consultants] not hurt them" and that his "views on new reps [were] very poor and likely fueling retail's discontent." J.A. 714. Barbara Blyth testified that management was troubled by Hayward's open boasting about the two poaching incidents. Her notes from the meeting in which the decision was made to terminate Hayward listed among the determinative factors that Hayward "denigrated peers (Mike Kennedy)." J.A. 715. In addition, there was evidence that Hayward was vocal in criticizing management's new business direction. For instance, at an informal gathering at a local restaurant, Hayward advised new financial consultants that, in order to "get ahead," they would have to "kiss a lot of ass." J.A. 461. He openly questioned senior management's restructuring of the company after Citizens Investment took over. *See* J.A. 463-64 (David Hunter, regional sales manager, testified that Hayward "did

not feel any respect for the decisions that were being made by the senior management," that Hayward "expressed a great deal of—a lack of trust of John [Halechko]" and "Lisa Binder" and that Hayward's criticism of management involved primarily the "structure of the program."). Indeed, the only evidence that Hayward's attitude was no worse than that of the other senior financial consultants was Halechko's testimony denying that Hayward was the "ring leader" in "not respecting newly hired, more junior financial consultants." J.A. 433-34.

In sum, there was, in my view, plenty of evidence to conclude that Citizens Investment would have fired Hayward without regard to any protected activity he engaged in.[2] This

---

[2] I limit my review of the record to Citizens Investment's affirmative defense to illustrate that the *whole* record included evidence impugning the Board's finding of pretext. I also believe, however, that my colleagues disregard evidence that undermines the Board's findings with regard to the General Counsel's prima facie case. For instance, the Board found that management took a "dim view" of the senior financial consultants' compensation-related complaints. This finding is undercut, however, by evidence that management expressly encouraged senior financial consultants' compensation-related complaints. *See* J.A. 643 (e-mail from Halechko to Chess in which Halechko reassured Chess he was not "complainer" for raising concerns about his compensation and Chess's points were "valid and important to many of [his] peers"); J.A. 666 (Halechko informed Hayward he did not want consultants' compensation concerns "swept under the rug"); J.A. 276 (Halechko encouraged Hayward to take compensation-related concerns up corporate ladder). Another example is the Board's mischaracterization of Hunter's testimony that Hayward displayed a "constant lack of deportment" in airing his various complaints. Hunter testified that, while Hayward complained about everything, it was not his complaining that posed a problem but his manner of doing so. *See* J.A. 458 (he "did not exhibit any restraint or decorum in his criticism"); *id.* 477 ("nothing wrong with complaining, but how you do it"). My colleagues also draw

5

evidence notwithstanding, our limited scope of review constrains me to join my colleagues in denying the petition for review.

---

inferences from the evidence that I believe are unwarranted. Particularly troublesome is the leap they (and the Board) make in interpreting the email Hayward signed as "union president, west." J.A. 671. While I have no quarrel with their conclusion that it evidenced "protected concerted activity," *see* maj. op. at 7-8, I do not think it can reasonably be interpreted as "significant circumstantial evidence of an impermissible motivation." J.A. 20; maj. op. 13 ("The timing of Hayward's discharge also supports the Board's finding of unlawful motive. The Company discharged him two weeks after he had identified himself as 'union president' in an email to Hunter."). Hayward had been making the same complaints for a long time and the Board missed the joke—according to Hayward's own testimony, the *soi-disant* "union president" line was intended to describe his role in bringing compensation issues to management's attention in a "funny" way. J.A. 235. The title was meant as a joke, not a "threateningly prounion" battle cry, J.A. 24, and the Board cited no evidence that management viewed it differently.