## NATIONAL LABOR RELATIONS BOARD *v.* WASHINGTON ALUMINUM CO.

No. 464. Argued April 10, 1962.—Decided May 28, 1962.

*Dominick L. Manoli* argued the cause for petitioner. With him on the briefs were *Solicitor General Cox, Stuart Rothman, Norton J. Come* and *Samuel M. Singer.*

*Robert R. Bair* argued the cause and filed briefs for respondent.

10

MR. JUSTICE BLACK delivered the opinion of the Court.

The Court of Appeals for the Fourth Circuit, with Chief Judge Soboleff dissenting, refused to enforce an order of the National Labor Relations Board directing the respondent Washington Aluminum Company to reinstate and make whole seven employees whom the company had discharged for leaving their work in the machine shop without permission on claims that the shop was too cold to work in.[1]  Because that decision raises important questions affecting the proper administration of the National Labor Relations Act,[2] we granted certiorari.[3]

The Board's order, as shown by the record and its findings, rested upon these facts and circumstances. The respondent company is engaged in the fabrication of aluminum products in Baltimore, Maryland, a business having interstate aspects that subject it to regulation under the National Labor Relations Act. The machine shop in which the seven discharged employees worked was not insulated and had a number of doors to the outside that had to be opened frequently. An oil furnace located in an adjoining building was the chief source of heat for the shop, although there were two gas-fired space heaters that contributed heat to a lesser extent. The heat pro-

---

[1] 291 F. 2d 869. The Court of Appeals also refused to enforce another Board order requiring the respondent company to bargain collectively with the Industrial Union of Marine & Shipbuilding Workers of America, AFL–CIO, as the certified bargaining representative of its employees. Since the Union's status as majority bargaining representative turns on the ballots cast in the Board election by four of the seven discharged employees, the enforceability of that order depends upon the validity of the discharges being challenged in the principal part of the case. Our decision on the discharge question will therefore also govern the refusal-to-bargain issue.

[2] 49 Stat. 449, as amended, 61 Stat. 136, 29 U. S. C. § 151 *et seq.*

[3] 368 U. S. 924.

duced by these units was not always satisfactory and, even prior to the day of the walkout involved here, several of the eight machinists who made up the day shift at the shop had complained from time to time to the company's foreman "over the cold working conditions." [4]

January 5, 1959, was an extraordinarily cold day for Baltimore, with unusually high winds and a low temperature of 11 degrees followed by a high of 22. When the employees on the day shift came to work that morning, they found the shop bitterly cold, due not only to the unusually harsh weather, but also to the fact that the large oil furnace had broken down the night before and had not as yet been put back into operation. As the workers gathered in the shop just before the starting hour of 7:30, one of them, a Mr. Caron, went into the office of Mr. Jarvis, the foreman, hoping to warm himself but, instead, found the foreman's quarters as uncomfortable as the rest of the shop. As Caron and Jarvis sat in Jarvis' office discussing how bitingly cold the building was, some of the other machinists walked by the office window "huddled" together in a fashion that caused Jarvis to exclaim that "[i]f those fellows had any guts at all, they would go home." When the starting buzzer sounded a few moments later, Caron walked back to his working place in the shop and found all the other machinists "huddled there, shaking a little, cold." Caron then said to these workers, ". . . Dave [Jarvis] told me if we had any guts, we would go home. . . . I am going home, it is too damned cold to work." Caron asked the other

---

[4] The Board made a specific finding on this issue: "We rely, *inter alia*, upon . . . the credited testimony of employees Heinlein, Caron, and George as to previous complaints made to the Respondent's foremen over the cold working conditions, and to the effect that the men left on the morning of January 5 in protest of the coldness at the plant . . . ." 126 N. L. R. B. 1410, 1411.

workers what they were going to do and, after some discussion among themselves, they decided to leave with him. One of these workers, testifying before the Board, summarized their entire discussion this way: "And we had all got together and thought it would be a good idea to go home; maybe we could get some heat brought into the plant that way." [5] As they started to leave, Jarvis approached and persuaded one of the workers to remain at the job. But Caron and the other six workers on the day shift left practically in a body in a matter of minutes after the 7:30 buzzer.

When the company's general foreman arrived between 7:45 and 8 that morning, Jarvis promptly informed him that all but one of the employees had left because the shop was too cold. The company's president came in at approximately 8:20 a. m. and, upon learning of the walkout, immediately said to the foreman, ". . . if they have all gone, we are going to terminate them." After discussion "at great length" between the general foreman and the company president as to what might be the effect of the walkout on employee discipline and plant production, the president formalized his discharge of the workers who had walked out by giving orders at 9 a. m. that the affected workers should be notified about their discharge immediately, either by telephone, telegram or personally. This was done.

On these facts the Board found that the conduct of the workers was a concerted activity to protest the company's failure to supply adequate heat in its machine shop, that such conduct is protected under the provision of § 7 of the National Labor Relations Act which guarantees that "Employees shall have the right . . . to engage in . . . concerted activities for the purpose of collective

---

[5] The Trial Examiner expressly credited this testimony and the Board expressly relied upon it. 126 N. L. R. B., at 1411.

bargaining or other mutual aid or protection," [6] and that the discharge of these workers by the company amounted to an unfair labor practice under § 8 (a)(1) of the Act, which forbids employers "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7." [7] Acting under the authority of § 10 (c) of the Act, which provides that when an employer has been guilty of an unfair labor practice the Board can "take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this Act," [8] the Board then ordered the company to reinstate the discharged workers to their previous positions and to make them whole for losses resulting from what the Board found to have been the unlawful termination of their employment.

In denying enforcement of this order, the majority of the Court of Appeals took the position that because the workers simply "summarily left their place of employment" without affording the company an "opportunity to avoid the work stoppage by granting a concession to a demand," their walkout did not amount to a concerted activity protected by § 7 of the Act.[9] On this basis, they

---

[6] 49 Stat. 452, as amended, 61 Stat. 140, 29 U. S. C. § 157. Section 7 in full is as follows: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8 (a)(3)."

[7] 49 Stat. 452, as amended, 61 Stat. 140, 29 U. S. C. § 158 (a)(1).

[8] 49 Stat. 453–454, as amended, 61 Stat. 146–147, 29 U. S. C. § 160 (c).

[9] 291 F. 2d, at 877.

held that there was no justification for the conduct of the workers in violating the established rules of the plant by leaving their jobs without permission and that the Board had therefore exceeded its power in issuing the order involved here because § 10 (c) declares that the Board shall not require reinstatement or back pay for an employee whom an employer has suspended or discharged "for cause." [10]

We cannot agree that employees necessarily lose their right to engage in concerted activities under § 7 merely because they do not present a specific demand upon their employer to remedy a condition they find objectionable. The language of § 7 is broad enough to protect concerted activities whether they take place before, after, or at the same time such a demand is made. To compel the Board to interpret and apply that language in the restricted fashion suggested by the respondent here would only tend to frustrate the policy of the Act to protect the right of workers to act together to better their working conditions. Indeed, as indicated by this very case, such an interpretation of § 7 might place burdens upon employees so great that it would effectively nullify the right to engage in concerted activities which that section protects. The seven employees here were part of a small group of employees who were wholly unorganized. They had no bargaining representative and, in fact, no representative of any kind to present their grievances to their employer. Under these circumstances, they had to speak for themselves as best they could. As pointed out above, prior to the day they left the shop, several of them had repeatedly complained to company officials about the cold working

---

[10] "No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause." 49 Stat. 453–454, as amended, 61 Stat. 146–147, 29 U. S. C. § 160 (c).

conditions in the shop. These had been more or less spontaneous individual pleas, unsupported by any threat of concerted protest, to which the company apparently gave little consideration and which it now says the Board should have treated as nothing more than "the same sort of gripes as the gripes made about the heat in the summertime." The bitter cold of January 5, however, finally brought these workers' individual complaints into concert so that some more effective action could be considered. Having no bargaining representative and no established procedure by which they could take full advantage of their unanimity of opinion in negotiations with the company, the men took the most direct course to let the company know that they wanted a warmer place in which to work. So, after talking among themselves, they walked out together in the hope that this action might spotlight their complaint and bring about some improvement in what they considered to be the "miserable" conditions of their employment. This we think was enough to justify the Board's holding that they were not required to make any more specific demand than they did to be entitled to the protection of § 7.

Although the company contends to the contrary, we think that the walkout involved here did grow out of a "labor dispute" within the plain meaning of the definition of that term in § 2 (9) of the Act, which declares that it includes "any controversy concerning terms, tenure or *conditions of employment* . . . ." [11] The findings of the Board, which are supported by substantial evidence and which were not disturbed below, show a running dispute between the machine shop employees and the company over the heating of the shop on cold days— a dispute which culminated in the decision of the

---

[11] 49 Stat. 450, as amended, 61 Stat. 137–138, 29 U. S. C. § 152 (9). (Emphasis supplied.)

employees to act concertedly in an effort to force the company to improve that condition of their employment. The fact that the company was already making every effort to repair the furnace and bring heat into the shop that morning does not change the nature of the controversy that caused the walkout. At the very most, that fact might tend to indicate that the conduct of the men in leaving was unnecessary and unwise, and it has long been settled that the reasonableness of workers' decisions to engage in concerted activity is irrelevant to the determination of whether a labor dispute exists or not.[12] Moreover, the evidence here shows that the conduct of these workers was far from unjustified under the circumstances. The company's own foreman expressed the opinion that the shop was so cold that the men should go home. This statement by the foreman but emphasizes the obvious— that is, that the conditions of coldness about which complaint had been made before had been so aggravated on the day of the walkout that the concerted action of the men in leaving their jobs seemed like a perfectly natural and reasonable thing to do.

Nor can we accept the company's contention that because it admittedly had an established plant rule which forbade employees to leave their work without permission of the foreman, there was justifiable "cause" for discharging these employees, wholly separate and apart from any concerted activities in which they engaged in protest against the poorly heated plant. Section 10 (c) of the Act does authorize an employer to discharge employees for "cause" and our cases have long recognized this right

---

[12] "The wisdom or unwisdom of the men, their justification or lack of it, in attributing to respondent an unreasonable or arbitrary attitude in connection with the negotiations, cannot determine whether, when they struck, they did so as a consequence of or in connection with a current labor dispute." *Labor Board* v. *Mackay Radio & Telegraph Co.*, 304 U. S. 333, 344.

on the part of an employer.[13]  But this, of course, cannot mean that an employer is at liberty to punish a man by discharging him for engaging in concerted activities which § 7 of the Act protects.  And the plant rule in question here purports to permit the company to do just that for it would prohibit even the most plainly protected kinds of concerted work stoppages until and unless the permission of the company's foreman was obtained.

It is of course true that § 7 does not protect all concerted activities, but that aspect of the section is not involved in this case.  The activities engaged in here do not fall within the normal categories of unprotected concerted activities such as those that are unlawful,[14] violent[15] or in breach of contract.[16]  Nor can they be brought under this Court's more recent pronouncement which denied the protection of § 7 to activities characterized as "indefensible" because they were there found to show a disloyalty to the workers' employer which this Court deemed unnecessary to carry on the workers' legitimate concerted activities.[17]  The activities of these seven employees cannot be classified as "indefensible" by any recognized standard of conduct.  Indeed, concerted activities by employees for the purpose of trying to protect themselves from working conditions as uncomfortable as the testimony and Board findings showed them to be in this case are unquestionably activities to correct conditions which modern labor-management legislation treats as too bad to have to be tolerated in a humane and civilized society like ours.

---

[13] See, e. g., Labor Board v. Jones & Laughlin Steel Corp., 301 U. S. 1, 45.

[14] Southern Steamship Co. v. Labor Board, 316 U. S. 31.

[15] Labor Board v. Fansteel Metallurgical Corp., 306 U. S. 240.

[16] Labor Board v. Sands Manufacturing Co., 306 U. S. 332.

[17] Labor Board v. Local Union No. 1229, International Brotherhood of Electrical Workers, 346 U. S. 464, 477.

18

We hold therefore that the Board correctly interpreted and applied the Act to the circumstances of this case and it was error for the Court of Appeals to refuse to enforce its order. The judgment of the Court of Appeals is reversed and the cause is remanded to that court with directions to enforce the order in its entirety.

*Reversed and remanded.*

MR. JUSTICE FRANKFURTER and MR. JUSTICE WHITE took no part in the consideration or decision of this case.