358 F.2d 411
 MORRISON-KNUDSEN COMPANY, Inc. and Hawaiian Dredging and
Construction Company, a Division of Dillingham
Corporation, a Joint Venture, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 No. 19925.
 United States Court of Appeals Ninth Circuit.
 March 24, 1966.
 
 Richard K. Sharpless, Lewis, Saunders & Sharpless, Honolulu, Hawaii, Thomas L. Smith, Boise, Idaho, for petitioner.
 Arnold Ordman, Gen. Counsel, Dominck L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Warren M. Davison, Paul M. Thompson, Attys., N.L.R.B., Washington, D.C., for respondent N.L.R.B.
 Before CHAMBERS, POPE and KOELSCH, Circuit Judges.
 KOELSCH, Circuit Judge.
 
 
 1
 Morrison-Knudsen Company, Inc. and Hawaiian Dredging and Construction Company, joint venturers, (hereinafter the 'Company') petition this court to review and set aside an order of the National Labor Relations Board. By answer, the Board has requested enforcement.
 
 
 2
 The Board concluded, in agreement with the trial examiner, that the Company violated Section 8(a)(1)[1] of the Act by discharging employees Fred Crawford and Michael Crawford because they had engaged in concerted activities protected by Section 7.[2] 49 N.L.R.B. No. 140. Its order directed the Company to offer the Crawfords reinstatement, to compensate them for loss of pay, and post appropriate notices.
 
 Briefly stated, the facts are these:
 
 3
 Fred Crawford and his son Michael were both employed on the Company's Lower Kula Road Project, Fred as a motor grader operator and Michael as a grade checker. However, on the morning of this particular day Michael was assigned to a labor crew in the charge of Foreman Guillot and put to work cleaning out culverts. This was done with compressed air. The size of the culvert made it necessary for a man to stand inside, and the force of the air raised great clouds of dust and blew debris about. Working in shifts, each member of the crew took a 10 or 15 minute turn with the nozzle while the other or others remained outside 'catching fresh air.' During the morning a state inspector, who happened by, told the crew's foreman to get goggles and respirators for the crew. This was not done, although the men 'griped' considerably among themselves about their difficulty in breathing and being hit with flying rocks. At noon the crew was joined for lunch by Fred. Michael stated he didn't feel like eating because the dust had made him sick. During lunch and repeatedly throughout the afternoon Fred persisted in complaining both to Guillot and to his own foreman about the Company's failure to supply the men with goggles and respirators. Finally Guillot ordered Michael into his truck and proceeded to also pick up Fred and drive them to where Fred's car was parked. He told Fred that either Michael would work in the culvert or they both could quit. Fred then drove Michael home and, on returning, was told that he (Fred) was 'all through.'
 
 
 4
 The Company contends that, even if the conduct of its employees constituted a protest over working conditions, under the facts of this case the protest was not an activity coming within the protection of Section 7.2A The Company interprets this provision to mean that the activities for 'other mutual aid or protection' must be related to 'the purpose of collective bargaining.' This is the proper construction, says the Company, because 'the national policy (of the Act) is based upon the national interest in such activities (i.e., organizing and collective bargaining), and any other activity must be related thereto.'
 
 
 5
 We do not agree that Section 7 must be so narrowly construed. In N.L.R.B. v. Washington Aluminum Co., 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962) there was no suggestion that the walkout was incident to any bargaining-- indeed the workmen involved were not organized and had no bargaining representative. Yet the Court held the 'activity' was protected under Section 7 as one for 'mutual aid or protection.' The Court's stress on the lack of such a representative does not, in our estimation, indicate a different result had the men been organized, but was noted to emphasize that 'under these circumstances, they had to speak for themselves as best they could.' And in Salt River Valley Water Users Ass'n v. N.L.R.B., 206 F.2d 325 (9th Cir. 1953), where it appeared that the employees engaged in the 'activities' in question were all members of a union but acted independently of their bargaining representative, this court declared that "concerted activities for the purpose of * * * mutual aid or protection' are not limited to union activities.' (p. 328). Joanna Cotton Mills Co. v. N.L.R.B., 176 F.2d (4th Cir. 1949) is to the same effect.
 
 
 6
 We agree with the Company that 'Section 7 rights are group rights, relating to 'concerted activity'.' But we part company when it argues that 'it is impossible to read the record as a whole and rationally reach the conclusion that the son was complaining.' The record is replete with testimony to the effect that not only Michael but indeed the entire crew voiced objections to the particular conditions under which the work was done. And although Fred was the principal actor, the evidence and its permissible inferences legitimately support the conclusion that his protest was also Michael's.
 
 
 7
 Fred was not himself exposed to the condition that constituted the grievance, but nevertheless we believe that his sympathetic action could be and was, as the Board concluded, 'for the purpose of * * * mutual aid and protection' within the meaning of Section 7. This court has recently held in N.L.R.B. v. Phaostron Instrument & Electric Co., 344 F.2d 855 (9th Cir. 1965), that fellow workmen were protected when they walked out in protest over the mistreatment of one of their own number. We think that this protection extends beyond those in the immediate group. In this view we are very favorably impressed by the perceptive opinion in N.L.R.B. v. Peter Cailler Kohler Swiss Chocolates Co., 130 F.2d 503, 505 (2d Cir. 1942). There the Second Circuit reasoned thus:
 
 
 8
 'Certainly nothing elsewhere in the act limits the scope of the language to 'activities' designed to benefit other 'employees'; and its rationale forbids such a limitation. When all the other workmen in a shop make common cause with a fellow workman over his separate grievance, and go out on strike in his support, they engage in a 'concerted activity' for 'mutual aid or protection,' although the aggrieved workman is the only one of them who has any immediate stake in the outcome. The rest know that by their action each one of them assures himself, in case his time ever comes, of the support of the one whom they are all then helping; and the solidarity so established is 'mutual aid' in the most literal sense, as nobody doubts. So too of those engaging in a 'sympathetic strike,' or secondary boycott; the immediate quarrel does not itself concern them, but by extending the number of those who will make the enemy of one the enemy of all, the power of each is vastly increased. It is one thing how far a community should allow such power to grow; but, whatever may be the proper place to check it, each separate extension is certainly a step in 'mutual aid and protection."
 
 
 9
 The Board, although disagreeing with the Examiner's conclusion that the condition precipitating the concerted activity was 'abnormally' dangerous, did approve his conclusion that it afforded a legitimate basis for complaint.[3] The parties have brought no case to our attention nor has our own considerable research revealed any, in this circuit or elsewhere, which announces a general test to determine what circumstances warrant activity for 'mutual aid and protection' under Section 7.[4] Indeed, due to the myriad matters that might require action, probably no single test would be possible. Here, of course, the concern is over working conditions; but we need not declare any test of how adverse they must be in order to justify complaint. It is sufficient to note that here certain safety precautions were prescribed by a positive statute of the State of Hawaii. Thus, Chapter 21-09 of the State of Hawaii General Safety Code reads in part as follows:
 
 
 10
 'Helmet, Goggles and Respirators.
 
 
 11
 Compressed air operations generally result in hazards and dust, vapors and flying debris. Operators and workmen in the vicinity of these hazards shall wear appropriate helmets, goggles and respirators.' In view of the fully supported findings of the fact finder regarding the method used to perform the job, the discomfort suffered by the crew and the absence of any goggles and respirators, the Company cannot successfully urge either that the above code provision is inapplicable or that Michael's complaint wholly lacked substance or related to matter too trivial for the Board's attention.
 
 
 12
 The evidence also provides adequate support for the Board's finding that Fred's conduct was within permissible bounds and that cause for his discharge did not exist. In this view, it appears that his activities were limited to verbal protests and that he did not, as the Company contended, usurp the authority of the foreman or interfere with the latter in directing the work. That his complaints irritated management is clear, but such is often an incident of a determined effort to secure an advantage. Unfortunately in this case, the desired effect was not achieved. The best we can say about the Company's argument is that the evidence was not without conflict and that there was contrary testimony which, if believed, would have afforded support for a finding in its favor. But, we are not prepared to say that, on this record, the fact finder's resolutions are so lacking in substance that the decision ought to be set aside.
 
 
 13
 What we have said regarding the evidence relating to Fred's discharge applies with added force to the examiner's conclusion that Michael was fired. Indeed, the evidence that Michael voluntarily quit is hardly plausible and largely consisted of the equivocal statement which appears on a Company termination slip that he 'quit-- refused to work because it was unsafe to work.'
 
 
 14
 The decree is affirmed and the order will be enforced.
 
 
 
 [1]
 Section 8(a). 'It shall be an unfair labor practice for an employer * * *
 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 of this title.'
 
 
 [2]
 Section 7. 'Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or portection, * * *'
 2A Section 7. 'Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, * * *'
 
 
 [3]
 Since the charge was laid under Section 7 of the Act, the allegation in the complaint and the examiner's corresponding findings that the working conditions were 'abnormally dangerous' were not material. Thus, the absence (or in this case the rejection) of that finding is hardly fatal to the validity of the Board's order
 
 
 [4]
 In the Aluminum Company case the complaint concerned lack of heat in the company plant during cold weather. The Court held the employees' walkout in pro test was protected but as to the condition itself merely said: 'Indeed, concerted activities by employees for the purpose of trying to protect themselves from working conditions as uncomfortable as the testimony and Board findings showed them to be in this case are unquestionably activities to correct conditions which modern labor-management legislation treats as too bad to have to be tolerated in a humane and civilized society like ours.' This statement was hardly intended as one announcing a rule of law