GARLAND, Circuit Judge,
dissenting in part:
This case presents a difficult question regarding the scope of Section 7 of the National Labor Relations Act, 29 U.S.C. § 157. “Determining whether activity is concerted and protected within the meaning of Section 7 is a task that ‘implicates [the Board’s] expertise in labor relations,’ ” and “[t]he Board’s determination that an employee has engaged in protected concerted activity is entitled to considerable deference if it is reasonable.” Citizens Inv. Servs. Corp. v. NLRB, 430 F.3d 1195, 1198 (D.C.Cir.2005) (quoting NLRB v. City Disposal Sys., Inc., 465 U.S. 822, 829, 104 S.Ct. 1505, 79 L.Ed.2d 839 (1984)). So, too, is the Board’s “interpretation of its own precedent.” Ceridian Corp. v. NLRB, 435 F.3d 352, 355 (D.C.Cir.2006) (internal quotation marks omitted). Of course, reasonable minds can differ about what is reasonable, and I certainly understand my colleagues’ reservations. But I am unable to conclude that the Board’s application of Section 7 to the facts of this case was unreasonable.
The Board’s decision here was limited to the “particular exigencies of the case” by a footnote setting out the views of Chairman Battista, whose acquiescence in the Board’s order was necessary to secure the two-member majority. Northeast Beverage Corp., 349 N.L.R.B. No. 1166, 1168 n. 12 (2007); cf. Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977). Chairman Battista expressly refrained from holding “that information gathering is always a basis for a work stoppage irrespective of the nature of the information sought or the duration of the work stoppage.” Northeast Beverage, 349 N.L.R.B. at 1168 n. 12. He noted that the incident at issue in this ease occurred during “a particularly vulnerable time for employees who are caught up in the transition” to a new employer that planned to close and merge their facility; that “[t]he employees here were not getting answers to critical questions regarding whether they would retain employment and, if so, what their seniority and pay would be”; and that “[t]hey absented themselves for 3 hours to seek assurances on these vital matters.” Id. The Board majority further noted “the obvious urgency of the drivers’ need for the information” regarding whether they would continue to be employed. Id. at 1168. And it found as facts that the drivers were seeking “to establish that they were ‘more than names on a list,’ ” thus “hop[ing] to influence their employer to retain them after the merger”; that Northeast’s requirements regarding drivers’ delivery schedules “were highly flexible”; and that their three-hour absence caused little or no disruption of the day’s deliveries. Id. Together, these circumstances reasonably support the Board’s determination “that the drivers’ conduct was protected activity as it was ‘mutual aid’ directly related to a labor dispute — the anticipated closing of the drivers’ work facility and the associated effects-bargaining.” Id. at 1166. These circumstances also reasonably support the Board’s conclusion that the instant case is distinguishable from precedents cited by Northeast. Id. at 1167-68.[1]
I also conclude that there is substantial evidence to support the Board’s “separate *142 finding” that Northeast “acted pursuant to a plan to avoid employing a significant number of union-represented employees at the merged Burt’s facility,” and that “[t]he reasons advanced by [Northeast] for suspending and discharging the drivers and for subsequently refusing to consider and refusing to hire them for employment at Burt’s were pretextual, and were asserted to conceal an antiunion motive.” Id. at 1166-67 n. 6; see id. at 1198 (ALJ Op.) (concluding that Northeast failed to meet its burden under Wright Line, 251 N.L.R.B. 1083 (1980), to demonstrate that it would have taken the same actions “in the absence of [the employees’] membership in and support for the Union”). The testimony of Northeast’s operations consultant established that, “even before May 29, 2002, [Northeast] did not want to hire any of the Vetrano drivers and did not want to recognize the Union at the merged facility” in Bethel. Id. at 1167 n. 6 (Board Op.); see id. at 1191-93 (ALJ Op.). Substantial evidence showed “that under the policies in place at B. Vetrano on May 29, [Northeast] would not have disciplined the employees for their activities” on that day. Id. at 1193; see id. at 1168 (Board Op.) (noting that “no driver had ever before been disciplined for making late deliveries”). It further showed that, although Northeast repeatedly “told the Union that jobs were not available [in Bethel,] at the same time ... it was advertising for drivers in the local newspapers.” Id. at 1192 (ALJ Op.). “When confronted with this contradiction, [Northeast’s president] said the ads were for warehouse people, a blatant untruth.” Id. Similarly, the reason Northeast gave at the hearing for not hiring the former Vetrano drivers' — that they lived too far from Bethel — was contradicted by the fact that Northeast hired other employees with similar commutes. Id. at 1192-93. This and other evidence is sufficient to support the conclusion that Northeast’s “policy was to avoid hiring Union-represented employees” and that the reasons it offered for suspending, discharging, and refusing to hire them at Bethel were pretextual. Id. at 1193.
For the foregoing reasons, I would deny Northeast’s petition and enforce the *143 Board’s order in full.[2]

. See GK Trucking Corp., 262 N.L.R.B. 570, 573 (1982) (ALJ Op.) (finding that a failure to *142 report to work to attend a union meeting was unprotected where there "was no urgency which called for a worktime consultation with union officials and indeed no evidence that work-related problems were actually discussed”); Terri Lee, Inc., 107 N.L.R.B. 560, 562-64 (1953) (finding that employees' absence from work was unprotected where the employer "specifically” warned the employees against it, and where it was not for the purpose of seeking anything from the employer); Gulf Coast Oil Co., 97 N.L.R.B. 1513, 1516 (1952) (finding that employees’ late arrival at work was unprotected where it “violated [the employer’s] known established [work] rule,” was for the purpose of engaging in union activity that was "customarily done during nonworking time,” and took place during work merely for the employees’ "own convenience”).
For its part, Northeast argues that the instant case is distinguishable from a Supreme Court precedent cited by the Board, NLRB v. Washington Aluminum Co., 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962). Unlike, its own precedents, we do not defer to the Board’s interpretation of precedents of the Supreme Court. And it is certainly true that the instant case can be distinguished from Washington Aluminum, which held that employees who left their shop because it was too cold were protected by Section 7. But nothing in Washington Aluminum forecloses the Board from finding that the conduct in this case was also protected, particularly given the Court’s declaration that employees do not "lose their right to engage in concerted activities under § 7 merely because they do not present a specific demand upon their employer to remedy a condition they find objectionable.” Id. at 14, 82 S.Ct. 1099. The only issue before this court is the Board’s determination that the drivers’ conduct was protected, and that is a determination to which we must defer if it is reasonable.

. I would deny Northeast’s petition with respect to the direct dealing issue for the reasons stated in the court’s opinion, supra.