The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number: _____

Filing Date: June 22, 2022

**No. A-1-CA-39379**

**IN THE MATTER OF THE DIRECT CRIMINAL CONTEMPT OF ALAN H. MAESTAS,**

      **Attorney-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF UNION COUNTY**
**Melissa A. Kennelly, District Judge**

Hector H. Balderas, Attorney General
Van Snow, Assistant Attorney General
Santa Fe, NM

for Appellee

Peifer, Hanson, Mullins & Baker, P.A.
Rebekah A. Gallegos
Sara N. Sanchez
Sarah K. Hyde
Albuquerque, NM

for Appellant

**OPINION**

**DUFFY, Judge.**

{1}    Attorney Alan Maestas was held in contempt of court after he refused to proceed with trial. The district court sentenced Maestas to 182 days of incarceration with 152 days suspended, a $999 fine, $55 in fees, and an undetermined amount of restitution. On appeal, Maestas challenges the propriety of his conviction for direct criminal contempt as well as the district court's sentence. We affirm Maestas's conviction for direct contempt. However, viewing the district court's sentence as an abuse of discretion, we remand for resentencing.

**BACKGROUND**

{2}    Maestas's contempt conviction arose during the course of his representation of a criminal defendant when Maestas refused to go forward with trial. The background of the criminal case is relevant to our analysis and the following recitation of events is gleaned from the record below. We emphasize, however, that none of the allegations against the defendant had been tested or proven at trial by the time this matter came to us on appeal, and therefore, nothing in this opinion should be construed as a determination on the matters at issue in the separate criminal case against the defendant.

{3}    The defendant, a semi-truck driver from Texas transiting through northern New Mexico, was stopped by law enforcement in Union County in March 2017 after

he failed to stop at the port of entry. During a search of the defendant's truck, officers discovered J.V., the 12-year-old daughter of the defendant's girlfriend, along with a narcotic pain pill, two opened condoms, and a bottle of lubricant. The defendant was placed on a twenty-four-hour driving hold and parked overnight at a travel stop in Clayton. The following day, officers returned to the truck to conduct a welfare check on J.V., during which they took custody of her and transferred her to the care of the Children, Youth and Families Department. J.V. underwent an initial safe house interview where she made no disclosure of sexual abuse and declined to undergo a sexual assault exam. In two subsequent safe house interviews, however, J.V. alleged that the defendant had sex with her while traveling through New Mexico. J.V. then underwent a sexual assault exam, which revealed injuries consistent with her allegations. The defendant was arrested and charged with criminal sexual penetration of a minor, child abuse resulting in great bodily harm, and enticement of a child.

{4}     Maestas entered his appearance in the defendant's case in September 2018, after the case had been pending for nearly a year and a half.[1] Maestas developed a defense theory that centered on discrediting the interview methods used to elicit the allegations J.V. made during her safe house interviews. Maestas retained Dr. Susan

---

[1] The defendant was initially represented by two other attorneys before retaining Maestas.

2

Cave, a clinical and forensic psychologist, as an expert witness who would provide testimony supporting the defense theory. The court qualified Dr. Cave as an expert witness after a *Daubert* hearing, and Dr. Cave's expert testimony became a crucial part of the defendant's defense.

{5} Maestas and the state vigorously litigated the case over the next two years. Trial was set and continued twelve times in total by either the defendant or the state, for a variety of reasons, or due to complications relating to the COVID-19 pandemic that struck New Mexico in March 2020. We focus here on the final continuance granted by the district court, and the ensuing trial setting itself, as these are the events that led to Maestas's contumacious conduct.

{6} On August 25, 2020, the district court issued an order continuing and resetting the jury trial scheduled to take place that day because the defendant's mother—whom he lived with and cared for—tested positive for COVID-19. Trial was reset for October 26, 2020. On October 9, Dr. Cave informed Maestas that she would be having surgery on October 27 and would not be able to testify during the October trial setting. Two business days later, Maestas filed a motion requesting a one-month trial continuance, citing Dr. Cave's unavailability and his recent discovery that the state had not disclosed or provided statements for two witness interviews that had occurred before Maestas took over as defense counsel. The district court held a hearing on the motion and questioned Dr. Cave directly. Dr. Cave explained that she

could not remember when Maestas told her that the trial had been continued to October 26. She further stated that her surgery had been scheduled for five weeks and that Maestas had told her about the new trial date at some point after that. During the hearing, the court ruled that Maestas had failed to timely notify Dr. Cave about the October trial date and concluded that failure was a matter of attorney negligence rather than an extraordinary circumstance necessitating a continuance.[2] In its written order, the court found that the case had been pending for three and one-half years, that Maestas had moved to continue the trial six times, and that "[i]t has become apparent to the Court that it is part of defense's strategy to delay trial for as long as possible in this matter." The district court denied the continuance and ordered the case to proceed to trial.

---

[2] We pause here to address the district court's focus on "extraordinary circumstances." The court provided a detailed explanation of events in its "decision & judgment and sentence on direct criminal contempt," noting that "[o]n January 7, 2020, the Court entered a scheduling order that advised the parties there would be no further trial continuances unless extraordinary circumstances required it." The court concluded that the unavailability of the defendant's expert witness "was not an extraordinary circumstance that justified another trial continuance." However, the same "extraordinary circumstances" language also appears in an earlier scheduling order, entered one month before the January 7, 2020, scheduling order on December 6, 2019. The December 6 scheduling order set the trial to occur in February. Shortly after that order was entered, the state requested a continuance because its "key witness," a SANE nurse, was unavailable. The court granted the continuance and this is what gave rise to the January 7, 2020, scheduling order that, ten months later, the court relied on as justification for denying the defendant's request for a continuance due to Dr. Cave's unavailability.

{7}     In response to that order, Maestas filed a motion on October 22—four days before trial—arguing that denial of the continuance violated the defendant's due process rights. Maestas indicated that he intended to appear in court on the trial date and would inform the court that he could not provide effective assistance of counsel without Dr. Cave's testimony. Maestas expressly stated that the purpose of the motion was to provide the court with notice to "call off jurors and to schedule other judicial matters." The court denied this motion the next day and ordered Maestas to appear at trial, stating that "[a]ny party or attorney who violates this order shall be subject to contempt of court and appropriate sanctions as permitted by law."

{8}     One final event delayed the October 26 trial setting: on the evening of October 25, the judge and district court staff arrived at the county courthouse in Clayton and were promptly snowed in by a storm that closed the courthouse for three days, delaying trial until the morning of October 29. That morning, Maestas filed a twenty-nine-page brief informing the court that he found himself in a dilemma: he was forced to choose between obstruction by disobeying the district court's command that he participate in the trial of the defendant or to proceed without being able to vigorously advocate on behalf of the defendant given his inability to present otherwise admissible expert testimony as to Defendant's theory of defense. Maestas's choice in resolving that dilemma would become clear during the morning's proceedings.

5

{9} The court called the case and, outside the presence of the jury, reiterated its ruling on the October 22 motion and asked Maestas how he wished to proceed. Citing American Bar Association (ABA) standards for representation of criminal defendants, Maestas responded by first outlining his argument that he was incapable of providing effective assistance of counsel and that he had informed the defendant of his inability to adequately represent him at trial. Maestas further stated that he had explained the ABA guidelines to the defendant, and since the defendant indicated he was unsure whether he wanted Maestas to continue or not, the defendant should be allowed to seek independent counsel in order to protect his constitutional rights.

{10} The court responded that effective assistance of counsel was a legal question for the court, not a determination to be made unilaterally by defense counsel. The court then provided a detailed explanation of why the denial of the continuance did not render counsel's assistance ineffective and did not deprive the defendant of due process. The court stated it found Meastas's attempt to essentially call off the trial by placing the court and the state on notice of his intentions not to proceed to be a "highly improper, unlawful, and unjustified obstruction of the administration of justice." The court ruled that Maestas was not rendered ineffective and ordered him to proceed with trial or be held in contempt. Before allowing Maestas to respond, the court reiterated that Maestas was on notice that he would be held in direct

criminal contempt should he refuse to proceed, and that the maximum fine and a significant jail sentence would be imposed.

{11}     Maestas responded by emphasizing his duty to his client and the Constitution as a criminal defense attorney. He noted that he appeared in front of the court with knowledge that he could be held in direct criminal contempt, and rather than simply refusing to appear and instead facing indirect contempt proceedings, possibly in front of a different judge, he appeared as directed. Speaking directly to the district court judge, Maestas stated that he would not subject his client to ineffective assistance of counsel, a conviction, and a lengthy appeals process, and would instead refuse to proceed. He then asked the court to review the brief he filed on the morning of trial, and should the court find him in direct contempt, asked that he be jailed in Taos County so that he could receive visitors.

{12}     Instead of delaying proceedings to read Maestas's brief, the court allowed him to make an oral record. The court asked Maestas one final time if he intended to proceed. Maestas refused, and the court held him in direct criminal contempt. The court then sentenced Maestas to a $1,000 fine, court costs, 364 days imprisonment with 334 days suspended followed by unsupervised probation, with the term of incarceration to be served in Union County. At the state's suggestion, the court also ordered restitution. The following week, the court sua sponte reduced Maestas's sentence to 182 days imprisonment, suspending 152 days, for a total term of

incarceration of thirty days, and ordered him to report to the Union County Sheriff's office ten days later to begin serving his sentence. The court also reduced his fine to $999 and ordered him to pay $55 in fees, while leaving restitution to be determined at a later hearing. Maestas timely appealed, which stayed the execution of his sentence under NMSA 1978, Section 39-3-15(A) (1966).

**STANDARD OF REVIEW**

{13} "Criminal contempt convictions may be routinely reviewed on appeal for arbitrariness and abuse of discretion." *Concha v. Sanchez*, 2011-NMSC-031, ¶ 46, 150 N.M. 268, 258 P.3d 1060. "The only limit on a contempt sentence is the trial court's discretion, which is reviewable on appeal." *Case v. State*, 1985-NMSC-103, ¶ 5, 103 N.M. 501, 709 P.2d 670. *But see State v. Case*, 1983-NMCA-086, ¶ 13, 100 N.M. 173, 667 P.2d 978 (noting that "[s]entences exceeding six months for criminal contempt may not be imposed absent a jury trial or waiver thereof"); *Seven Rivers Farm, Inc. v. Reynolds*, 1973-NMSC-039, ¶ 42, 84 N.M. 789, 508 P.2d 1276 (holding that a jury trial is not required as long as the fine imposed does not exceed $1,000). "An abuse of discretion occurs when a ruling is clearly contrary to the logical conclusions demanded by the facts and circumstances of the case." *Benz v. Town Ctr. Land, LLC*, 2013-NMCA-111, ¶ 11, 314 P.3d 688 (internal quotation marks and citation omitted).

8

**DISCUSSION**

{14}     Maestas advances two primary arguments on appeal. First, Maestas challenges the propriety of holding him in direct criminal contempt. He argues that he had a complete defense to criminal contempt or, alternatively, that he should have been subject to indirect criminal contempt proceedings. Second, Maestas argues that the district court abused its discretion by imposing an excessive sentence and restitution. We are unpersuaded by Maestas's challenge to the propriety of his conviction. We do, however, perceive two abuses of discretion in the district court's sentencing decision.

**I.     The District Court Did Not Err by Holding Maestas in Direct Criminal Contempt**

{15}     Under statutory and common law, judges are vested with inherent power to compel obedience to their orders and maintain decorum in their courtrooms. *Concha*, 2011-NMSC-031, ¶¶ 22-23. Contempt powers allow courts to guard their proceedings against anything that interferes with the orderly administration of justice. *Case*, 1985-NMSC-103, ¶ 5. Civil contempt proceedings are intended to obtain compliance with a court order, *State v. Pothier*, 1986-NMSC-039, ¶ 4, 104 N.M. 363, 721 P.2d 1294, while "[c]riminal contempt proceedings are instituted to punish completed acts of disobedience that have threatened the authority and dignity of the court." *Concha*, 2011-NMSC-031, ¶ 26. "Criminal contempts are further delineated as direct or indirect." *Id.* ¶ 24 (internal quotation marks and citation

9

omitted). Direct contempt involves "charges of misconduct, in open court, in the presence of the judge, which disturbs the court's business, where all of the essential elements of the misconduct are under the eye of the court [and] are actually observed by the court." *Id.* ¶ 35 (internal quotation marks and citation omitted). Indirect criminal contempt arises "[w]hen the judge has not personally witnessed the defendant's contemptuous behavior in the course of a court proceeding." *Id.* ¶ 28.

{16}     Since "criminal contempt is a crime in the ordinary sense," a criminal contempt defendant is entitled to due process protections, the extent of which depend on whether the contempt charge is categorized as direct or indirect. *Id.* ¶ 26 (alteration, internal quotation marks, and citation omitted). In direct contempt proceedings, a judge may punish the contemnor summarily without the need for further evidentiary proceedings. *Id.* ¶ 27. In indirect proceedings where the judge has not personally witnessed the defendant's contumacious actions, the contempt "must be resolved through more traditional due process procedures." *Id.* ¶ 28; *see also State v. Stout*, 1983-NMSC-094, ¶ 9, 100 N.M. 472, 672 P.2d 645 (recognizing that "some kind of formal notice and hearing was required because the contempt was not committed in the presence of the court").

{17}     We turn now to Maestas's two challenges to the propriety of his conviction. Maestas first argues that he had a complete defense to direct criminal contempt because he had a good-faith belief that he could not comply with the court's order.

10

Maestas contends that the court's order to proceed with trial "put [him] in an untenable position: refuse to proceed and face contempt charges or proceed to trial without the necessary expert and all but ensure his client would be deprived of effective assistance of counsel, convicted of a serious crime, and almost certainly incarcerated for years while the appellate process played out." While we appreciate the precarity of Maestas's position, we are unpersuaded that the court erred in holding him in contempt.

{18}   At bottom, this line of argument challenges the sufficiency of the evidence supporting Maestas's contempt conviction. As with any criminal conviction, a criminal contempt conviction must be based on evidence constituting proof beyond a reasonable doubt. *In re Stout*, 1984-NMCA-131, ¶ 11, 102 N.M. 159, 692 P.2d 545. And while an "[i]nability without fault to comply with a court's order is a defense to a contempt charge," *id.* ¶ 13, we are unpersuaded that this defense is applicable here.

{19}   Cases applying the inability to comply defense are factually distinct from the circumstances presented in this case. In *In re Stout*, for instance, this Court reversed an attorney's contempt conviction for failure to appear at a sentencing hearing because the attorney was required to be in another court at the same time and had arranged for substitute counsel, thereby excusing his absence. *Id.* ¶¶ 14-15. Similarly, in two Depression era cases, our Supreme Court reversed contempt

11

convictions for destitute men unable to pay judgments arising out of divorce proceedings, holding that inability to pay was a defense to contempt for failure to satisfy the judgments. *See Sears v. Sears*, 1939-NMSC-010, ¶ 13, 43 N.M. 142, 87 P.2d 434; *Andrews v. McMahan*, 1938-NMSC-074, ¶ 14, 43 N.M. 87, 85 P.2d 743.

{20} But here, Maestas has only shown that he had a good-faith belief that proceeding to trial without his expert would deny his client effective assistance of counsel. Regardless of whether that assessment was correct, Maestas could have proceeded with trial and attempted to defend his client to the best of his abilities. Unlike *In re Stout*, where a lawyer could not physically be in two places at once, or *Sears* and *Andrews*, where destitute men lacked money to pay judgments and could not find jobs during a historic economic calamity, there were no circumstances making it impossible for Maestas to comply with the district court's order.

{21} Maestas also offers an alternative argument that the district court should have referred him for prosecution for indirect, rather than direct, criminal contempt and afforded him the additional due process protections inherent in that charge. Maestas contends that direct contempt proceedings were inappropriate because there was additional evidence outside the presence of the court that bears on his good-faith defense. This argument is unpersuasive for two reasons.

{22} First, Maestas's defense based on his perceived inability to comply with the court's order was not sufficient to excuse his contumacious conduct. Second,

Maestas has provided no authority indicating that indirect contempt proceedings are necessary where a defendant openly and directly disobeys a court order in the presence of the court. Maestas analogizes this case to *State v. Diamond*, 1980-NMCA-026, 94 N.M. 118, 607 P.2d 656, and *In re Stout*, 1984-NMCA-131, where attorneys were subject to indirect contempt proceedings after failing to appear in court. This analogy fails for the simple reason that in both of those cases, the contumacious conduct occurred outside the presence of the court. Summary adjudication was improper because the judge did not directly observe the contumacious acts in either case. *See Diamond*, 1980-NMCA-026, ¶ 12 (citing *Johnson v. Mississippi*, 403 U.S. 212, 214 (1971) for the proposition that summary contempt proceedings are proper where the judge directly observes the contumacious act); *In re Stout*, 1984-NMCA-131, ¶¶ 10-11. In contrast, Maestas appeared in court and refused to follow the court's order, even stating that he expected to be held in direct criminal contempt, despite the fact that he could have refused to appear and been subject to indirect contempt proceedings. Maestas's admission speaks for itself. His conduct is exactly the type that constitutes direct criminal contempt, and we hold Maestas was not entitled to indirect contempt proceedings.

{23} Finally, though we are not unsympathetic to the position in which Maestas found himself, we reiterate our recent observation in *State v. Hildreth* that "attorneys

in New Mexico are not empowered with decisional autonomy regarding when trials commence and when they do not commence. District courts are." 2019-NMCA-047, ¶ 16, 448 P.3d 585, *aff'd in part, rev'd in part on other grounds*, 2022-NMSC-012, 506 P.3d 354. Maestas's belief that he could not provide effective assistance of counsel does not relieve him of culpability in refusing to obey a court order. We see no abuse of discretion in the district court's decision to hold Maestas in direct criminal contempt, nor do we view the evidence presented here as insufficient to support his conviction. Accordingly, we affirm the district court's finding of direct criminal contempt.

## II.     The District Court Abused Its Discretion in Sentencing Maestas

{24}     Maestas next challenges the propriety of his sentence. Specifically, Maestas argues that the district court abused its discretion in sentencing him to 182 days of incarceration with 152 days suspended, a $999 fine, and court costs. Maestas also contends that the district court erred in imposing restitution. We address each issue in turn.[3]

## A.     The District Court Abused Its Discretion by Imposing a Uniquely and Disproportionately Harsh Sentence

{25}     Our Supreme Court has cautioned that a judge's inherent contempt authority is an "extraordinary unilateral power[]" that requires judges to exercise

---

[3]Maestas further argues that the district court imposed a sentence in excess of six months, which deprived him of his due process right to a jury trial. *See Case*,

14

"extraordinary self-restraint" to avoid abuses of that power. *Concha*, 2011-NMSC-031, ¶ 30; *see also Case*, 1985-NMSC-103, ¶ 5 (stating that "contempt powers of the court should be used cautiously and sparingly"). "A judge's exercise of the contempt power must be tailored to the contemptuous conduct, exerting just enough judicial power to right the wrong; no more, no less." *Concha*, 2011-NMSC-031, ¶ 45; *see also Case*, 1985-NMSC-103, ¶ 4 ("The punishment imposed should be reasonably related to the nature and gravity of the contumacious conduct."). As numerous reported cases have emphasized, judges "should not exercise more than the least possible power adequate to the end proposed." *Pothier*, 1986-NMSC-039, ¶ 31.

{26} In *Pothier*, our Supreme Court articulated three factors courts must consider when imposing punishment for criminal contempt: (1) the severity of the consequences of the contempt; (2) the public's interest in terminating the contemnor's defiance; and (3) the importance of deterring future defiance. *Id.* ¶ 32. The first two *Pothier* factors do not clearly cut for or against the sentence imposed here. Maestas maintains that the main consequence of his conduct was that the

1983-NMCA-086, ¶ 13. Because we hold that the district court's sentence was a substantive abuse of discretion, we do not consider (1) whether the sentence of 182 days is, in fact, a sentence that exceeds six months, and (2) whether we measure the total sentence imposed or, as the State argues, only the term of incarceration. *See Allen v. LeMaster*, 2012-NMSC-001, ¶ 28, 267 P.3d 806 ("It is an enduring principle of constitutional jurisprudence that courts will avoid deciding constitutional questions unless required to do so." (internal quotation marks and citation omitted)).

15

defendant's trial did not proceed. The State responds that a defense attorney refusing to go forward with trial is serious in itself, *see Hildreth*, 2019-NMCA-047, ¶ 16 (observing that such conduct violates an attorney's "constitutional responsibility to his client and his duty to the tribunal for which, as a licensed attorney, he serves as an officer"), and wastes the court's time and resources, as well as the time of witnesses and jurors. Though the State makes a compelling argument, we note that Maestas attempted before the trial date to mitigate those consequences: he requested the continuance twelve days before trial, soon after he learned of Dr. Cave's scheduling conflict, and he filed a motion putting the court on notice of his intended course of action.

{27}    Similarly, the parties offer competing arguments on the public's interest. Maestas reminds us that the public directly benefits from "fearless, vigorous, and effective advocacy" for criminal defendants, and quotes *In re McConnell*, 370 U.S. 230, 236 (1962) for the proposition that counsel must "be able to make honest good-faith efforts to present their clients' cases." The State counters that the public has a strong interest in having persons obey lawful court orders and that both the public and criminal defendants have a strong interest in the speedy adjudication of serious crimes. We view both of these interests as important.

{28}    Ultimately, however, there is no question that deterring future defiance is very important and punishment is necessary. The *Pothier* Court analyzed the deterrent

value of a contempt sentence by comparing the sentence imposed to what New Mexico courts have done in previous cases. *See* 1986-NMSC-039, ¶ 35. We use the same analysis to evaluate the district court's sentencing decision and look to cases in which attorneys have been held in contempt. We confine our review in this manner in recognition that Maestas's conduct can fairly be characterized as purely on behalf of his client's interest, to his own detriment. While we have found no reported cases in which an attorney has gone to the same lengths in service of a client's interests, the choice Maestas faced arose from a perceived conflict in his professional and ethical obligations to his client and to the court. The tension created by those dual obligations, and the corresponding balancing of interests, is unique to attorneys acting in their professional role and seemingly absent in contempt cases involving laypeople. *See, e.g., Case*, 1985-NMSC-103, ¶ 3 (addressing criminal contempt punishment for a defendant who was given use immunity against prosecution but subsequently refused to answer questions in a homicide case). For this reason, the appropriate comparative analysis should focus on contempt punishments imposed on attorneys acting in their professional role.

{29} Compared to reported contempt sentences imposed on New Mexico attorneys, the district court's sentence in this case was undeniably harsh. Indeed, our review of New Mexico jurisprudence reveals no reported appellate decision affirming—or even considering—a contempt sanction against an attorney as severe as this one. The

17

majority of reported decisions involve the imposition of no more than a monetary fine in circumstances where an attorney failed to comply with a district court's instructions or rules of procedure. *See, e.g.*, *In re Avallone*, 1978-NMSC-056, ¶¶ 5, 10, 91 N.M. 777, 581 P.2d 870 (affirming this Court's imposition of a $250 fine on an attorney who failed to conform to the rules of appellate procedure); *State v. Wisniewski*, 1985-NMSC-079, ¶¶ 1, 22, 103 N.M. 430, 708 P.2d 1031 (upholding $100 contempt citations imposed on two prosecutors and two police officers who failed to comply with discovery requirements under the Rules of Criminal Procedure). In *In re Byrnes*, 2002-NMCA-102, ¶¶ 1, 3-7, 132 N.M. 718, 54 P.3d 996, this Court affirmed a $1,000 contempt fine imposed on an attorney who continually interrupted and argued with the district court judge during a custody hearing, despite several admonitions to stop.

{30} In another illustrative case, *In re Cherryhomes*, an attorney was summarily held in contempt after he became combative and belligerent. 1985-NMCA-108, ¶ 3, 103 N.M. 771, 714 P.2d 188. The district court imposed a $10,000 fine, which this Court determined was excessive since it required a trial by jury under New Mexico law. *Id.* ¶ 7 (noting that the New Mexico Supreme Court has held that "a fine in excess of $1,000 gives the defendant the right to a jury trial"). The case was remanded with instructions to reduce the fine to $1,000 or to proceed with a jury trial. *Id.* ¶ 9. The same attorney came before this court again in *State v. Cherryhomes*,

18

1992-NMCA-111, ¶¶ 2-3, 114 N.M. 495, 840 P.2d 1261, when the district court imposed a $50 contempt fine after the attorney refused to take off a bandana and put on a tie while in court, as required by local court rules. The attorney appealed, and we affirmed the conviction and sentence. *Id.* ¶ 23.

{31} Our Supreme Court has also imposed serious contempt punishments for attorney misconduct, but we have not found any published case in which the Court issued a sentence comparable to the one imposed here. In *In re Palafox*, our Supreme Court imposed $250 fines on two attorneys who violated rules governing non-admitted counsel. 1983-NMSC-078, ¶¶ 6, 8, 100 N.M. 563, 673 P.2d 1296. Likewise, in a series of three disciplinary proceedings against the same attorney, the Court used its contempt power to first impose a $500 fine on an attorney for violating discovery orders. *In re Herkenhoff* (*Herkenhoff I*), 1993-NMSC-081, ¶ 10, 116 N.M. 622, 866 P.2d 350. After the attorney refused to comply with the initial disciplinary order, the Court imposed a $1540 fine—$10 per day of noncompliance—at a 15 percent interest rate. *In re Herkenhoff* (*Herkenhoff II*), 1995-NMSC-011, ¶ 12, 119 N.M. 232, 889 P.2d 840. The Court also disbarred the attorney. *Id.* ¶ 11. After the attorney continued to practice law despite his disbarment, the Court again held him in contempt and imposed a five-month sentence of incarceration, but suspended the entire sentence, conditioned on the attorney's compliance with the prior disciplinary orders. *In re Herkenhoff* (*Herkenhoff III*), 1997-NMSC-007, ¶¶ 20-21, 122 N.M.

766, 931 P.2d 1382. The court issued an almost identical sentence in *In re Schmidt*, where a disbarred attorney continued to practice law in direct violation of a prior disciplinary order. 1997-NMSC-008, ¶ 15, 122 N.M. 770, 931 P.2d 1386 (per curiam). As in *Herkenhoff III*, the Court imposed a five-month suspended sentence with conditions that the attorney cease practicing law and begin complying with the prior disciplinary order. *In re Schmidt*, 1997-NMSC-008, ¶ 15.

{32} Finally, we have found only one reported decision in which a district court imposed a sentence of incarceration against a contumacious attorney, and the conduct meriting the contempt punishment was comparatively more egregious. *State v. Driscoll*, 1976-NMSC-059, ¶¶ 5-10, 89 N.M. 541, 555 P.2d 136. In *Driscoll*, an attorney disobeyed a court's order not to mention a witness affidavit during opening argument, and after being admonished by the court, removed his tie and coat and aggressively approached the bench. *Id.* The judge immediately remanded the attorney into custody but released him a few hours later, stating that the matter would be taken up by another judge in a show-cause proceeding. *Id.* ¶¶ 7-9. At the show-cause proceeding, the attorney was sentenced to ten days of incarceration, but our Supreme Court reversed the sentence and conviction on double jeopardy grounds. *Id.* ¶¶ 11, 19.

{33} Taken together, these cases demonstrate the unusual severity of the contempt punishment imposed by the district court in this case. The harshest fine imposed on

20

an attorney was the $1540 collective fine imposed in *Herkenhoff II*, 1995-NMSC-011, ¶ 12, and when our Supreme Court has imposed incarceration as a contempt punishment in disciplinary proceedings, it has suspended the sentences in full. In this case, the district court sentenced Maestas to thirty days' incarceration (182 days incarceration with 152 days suspended), a $999 fine, $55 in court costs, and restitution. By all accounts, Maestas's sentence is extraordinary in that it significantly exceeds that of any sentence imposed in a contempt case arising from attorney misconduct. Viewed through the lens of deterrence, the imposition of a month-long jail sentence and the specter of a full six months in jail if he happened to violate the conditions of his probation may well be an effective means of deterring an attorney from ever again engaging in this sort of behavior. But the question is not simply whether the punishment will deter future defiance, it is whether this was the least possible punishment necessary do so. *See Concha*, 2011-NMSC-031, ¶ 45; *Pothier*, 1986-NMSC-039, ¶ 31. When compared to other cases, we conclude that it was not.

{34}   We are cognizant that district courts are afforded broad discretion in their exercise of the contempt power. However, that discretion is not without limits, and the unilateral nature of direct criminal contempt proceedings requires judges to exercise extraordinary restraint in imposing contempt sentences. *See Concha*, 2011-NMSC-031, ¶ 30 (cautioning that the contempt power is an "extraordinary unilateral

21

power[]" that requires judges to exercise "extraordinary self-restraint" to avoid abuses of the authority). It has been repeated often enough: the sentence must be narrowly tailored to exert "just enough judicial power" to vindicate the court's authority and dignity, so as to avoid abuses of those powers. *See id.* ¶¶ 30, 45. Because the sentence in this case exceeded that threshold, we determine that it was an abuse of the district court's discretion and remand for resentencing.

**B.      Restitution Is Not Appropriate in This Case**

{35}      In its sentencing order, the district court required Maestas to pay restitution to "the people of Union County" in an amount to be determined at a future restitution hearing. Criminal restitution is authorized by statute. *See* NMSA 1978, § 31-17-1 (2005). Maestas argues that the district court misapplied the statute and wrongly imposed a sentence of restitution. We agree.

{36}      We review the district court's restitution order for an abuse of discretion. *State v. George*, 2020-NMCA-039, ¶ 4, 472 P.3d 1235. A trial court abuses its discretion when it imposes a sentence contrary to law. *State v. Lente*, 2005-NMCA-111, ¶ 3, 138 N.M. 312, 119 P.3d 737. In order to determine whether the court acted contrary to law, we review the district court's interpretation of Section 31-17-1 de novo. *See State v. Duhon*, 2005-NMCA-120, ¶ 10, 138 N.M. 466, 122 P.3d 50.

{37}      Section 31-17-1(A) states, "It is the policy of this state that restitution be made by each violator of the Criminal Code . . . to the victims of his criminal activities to

22

the extent that the defendant is reasonably able to do so." Restitution is intended to "make whole the victim of the crime to the extent possible." *State v. Lack*, 1982-NMCA-111, ¶ 12, 98 N.M. 500, 650 P.2d 22 (noting that "[r]estitution in a proper case may oftentimes be a compelling reminder of the wrong done and meaningfully contribute to the rehabilitation process" (internal quotation marks and citation omitted)). Section 31-17-1(A)(1) defines a "victim" as "any person who has suffered actual damages as a result of the defendant's criminal activities." "Actual damages" are those that "a victim could recover against the defendant in a civil action arising out of the same facts or event, except punitive damages and [non-economic] damages." Section 31-17-1(A)(2). Before approving a sentence of restitution, a trial court must consider a number of factors, including the actual damages suffered by each victim. Section 31-17-1(E).

{38} New Mexico courts have never construed an order of restitution in the context of criminal contempt. But the plain language and purpose of the statute indicate that restitution, as applied, is not an appropriate punishment here. The State identified "the people of Union County" as victims for purposes of restitution under Section 31-17-1(A)(1). In this case, there has been no showing that the people of Union County suffered or would be able to recover actual damages from Maestas in a civil action. *See* § 31-17-1(A)(2); *George*, 2020-NMCA-039, ¶ 8 (stating that a victim may receive restitution only when there is "a direct relationship between the crime

23

for which there is a plea of guilty or verdict of guilty, and the damages asserted by the victim" (internal quotation marks and citation omitted)). Further, while the State points out that this Court has previously recognized that state entities can be considered victims for purposes of restitution, *see, e.g.*, *State v. Ellis*, 1995-NMCA-124, ¶ 7, 120 N.M. 709, 905 P.2d 747, the court's order of restitution in this case does not identify a particular state entity, such as Union County itself. Rather, the court ordered Maestas to pay restitution to an ill-defined group of individuals with no showing that *this* group suffered an actual loss as a result of Maestas's contempt. In short, the State has not demonstrated how "the people of Union County" qualify as victims under Section 31-17-1. Accordingly, we reverse the district court's order of restitution. *See Lente*, 2005-NMCA-111, ¶ 3.

**CONCLUSION**

{39}    We affirm Maestas's conviction for direct criminal contempt. However, the district court's sentencing order is vacated, and the case remanded for resentencing consistent with this opinion.

{40}    **IT IS SO ORDERED.**

_____
**MEGAN P. DUFFY, Judge**

24

**WE CONCUR:**

_____
**J. MILES HANISEE, Chief Judge**

_____
**JANE B. YOHALEM, Judge**

25